[Filed January 6, 1891.]

## ELIZABETH POTTER *v.* CYRUS JONES ET AL.

DELUSIONS.—Delusions are conceptions that originate spontaneously in the mind without evidence of any kind to support them, and can be accounted for on no reasonable hypothesis. They have no foundation in reality, and spring from a diseased or morbid condition of the mind.

IDEM—INSANITY—ERROR OF JUDGMENT.—Where a person persistently believes supposed facts which have no real existence except in his perverted imagination and against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, he is, so far as they are concerned, under a morbid delusion, and delusion in that sense is insanity. But where the belief or aversion to the contestant was formed on an apparent cause, leading on his part to a view unjust and erroneous, this only shows an unfortunate error of judgment or a want of reasoning power, but not an absolute want of intellect on the subject. It shows a bad judgment upon an insufficient state of facts, but not that his conclusion was formed without any foundation in fact, apparent or otherwise. It is not enough that a delusion may exist, but its connection with the testator's will must be made

| | |
|---|---|
| 20 | 239 |
| 24 | 177 |
| 25* | 769 |
| 33* | 543 |

| | |
|---|---|
| 20 | 239 |
| 40 | 579 |

| | |
|---|---|
| 20 | 239 |
| 42 | 357 |

manifest and shown to have influenced its provisions before the will can be set aside and declared void.

DELUSION NOT CONNECTED WITH WILL.—Where it was claimed that the testator was the subject of an insane delusion, but admitted to be of sound mind on all other subjects not connected with such delusion, but which delusion the evidence disclosed—assuming such delusion to have ever existed—was not present influencing him when he executed the will; *held*, that the will was valid.

TESTAMENTARY CAPACITY — DEGREE OF IMMATERIAL.—While it seems harsh and cruel that a parent should disinherit one of his children and devise his property to others, or cut them all off and devise it to strangers from some unworthy motive, yet so long as that motive, whether from pride, or aversion, or spite, or prejudice, is not resolvable into mental perversion, no court can interfere.

REASONS FOR WILL NOT REVIEWED.—It is enough that the law recognized the right of the parent to make such testamentary disposition of his property as he chooses to select as the object of his bounty, and in the exercise of this right he may have reasons satisfactory to himself why some of his children should enjoy his estate while others are excluded. Some may be more deserving than others, more needful of help for various reasons; some may have contributed largely to its acquisition: these and other reasons may exert an influence in favor of some and in exclusion of others.

Clackamas county: FRANK J. TAYLOR, Judge.

Defendants appeal. Reversed.

*Ira Jones,* for Respondent.

*W. W. Thayer,* and *D. C. & C. D. Latourette,* for Appellants.

LORD, J.—This was a proceeding instituted in the county court of Clackamas county by the contestant to have the order admitting to probate the will of her father, Cyrus W. Jones, deceased, vacated and annulled, and the will set aside and declared void. The will was executed on the 19th day of January, 1887, and the testator died on the 20th day of August, 1887, leaving several children, to whom he devised his property, with the sole exception of the contestant, who was excluded from its bounty. The proceeding resulted in a decree vacating the order, and setting aside the will as void, which was affirmed on appeal by a decree of the circuit court, and from which this appeal is taken. The theory upon which the will is alleged to be void is, that the testator, though conceded to be of sound mind upon all other subjects, was laboring under a delusion in relation to the legitimacy of his daughter, the contestant, causing him to entertain a violent hatred or insane aversion toward her, which rendered him wholly incapable of doing any legal act in which her interest was involved, and which so affected

and influenced him at the time of the execution of his will as caused him to deprive her of all benefit in his estate.

The record discloses that the testator was married to his wife on the 10th day of May, 1835, in the state of Ohio; that a few years thereafter they emigrated to Missouri, where they continued to reside until 1861, when they emigrated to Oregon, having at this time a family of ten children, and settled in Marion county, on what is commonly known as "Mission Bottom." Here they continued to reside until 1865, when they started on a return trip to Missouri, taking with them two of their boys and three of their girls, one of whom is the contestant, and going by the way of California, where they stopped for a short time, and where the two boys concluded to remain. The parents, with their three daughters, went on to Missouri, and after their arrival there his wife and the contestant, of their own choice, left him and went to Ohio, where they remained and never lived afterward with him. The testator returned to Oregon in 1867, with the other two girls. He bought another farm in Marion county, where he resided for a few years, and then purchased the farm in Clackamas county, to which he moved and where he was living when the will was executed and until his death. In 1872 he obtained a decree of divorce from his wife on the ground of desertion and cruel treatment.

The evidence shows that the testator was a man of sensitive disposition and of a nervous and jealous temperament; that early after his marriage, and especially while he and his wife resided in Missouri, he became suspicious of her chastity, and entertained the belief that she was intimate with a man who met her near a certain spring for adulterous purposes, and that two of the children, the contestant and Calvin Jones, were the offspring of such adulterous embraces. He also expressed the belief that another person in Oregon, while they lived together here, was on intimate terms with her, and at one time sought to chastise him for his supposed conduct. This belief, however, in the infidelity of his wife and the illegitimacy of two of

his children, was not proclaimed from the housetop, or to every one, but, with few exceptions, and those intimate friends, it was only communicated to his brothers. His daughters who lived with him and are now married never seem to have heard of the matter or knew he entertained such a belief until the commencement of this suit. They knew there was an estrangement between their parents, and that they did not live happily together, but they never supposed the cause of it was due to any morbid delusion involving the chastity of their mother or the illegitimacy of any of the children.

To avoid prolixity, we shall say our conviction from the evidence is, that his wife was a chaste woman and faithful to her marriage vows, and that the two children named were not the spurious product of her adulterous embraces with another man; but the fact remains, according to the testimony of those to whom he confided his domestic troubles, that he always furnished some grounds for his belief. He identified the party and place, and described the clandestine manner by which their improper meeting was effected. That such things could occur or have occurred under less probable circumstances, will not be denied. They are only rendered improbable in the present instance by the absolute confidence expressed in her marital fidelity by her acquaintances. While, therefore, we shall regard this suspicion or belief of her infidelity to her marriage bed with its attendant circumstances as unjust and unworthy of belief, we cannot disregard the fact that there was the opportunity for the parties to have met at the spring, and it might have occurred in reality for perfectly proper and innocent purposes, or without evil design or any concert of action, yet, to a man of the testator's sensitive and jealous disposition, a trifling circumstance of this kind or a slightly imprudent act would incite his distrust and fill him with jealous suspicions. Whether there was any such visits to the spring near his residence, surreptitious or otherwise, by his wife and the suspected party while they lived in Missouri, there is

nothing shown by the evidence except his declarations to the persons already referred to, that he had often seen such party go to the spring, when his wife would don her bonnet and go clandestinely to the same place. The evidence of those whose testimony leads to the conviction that his suspicions or accusations were unjust and unfounded, rest not upon any knowledge of the facts one way or the other, but on their knowledge of her character and confidence in her chastity as inconsistent with such conduct. Mr. Sampson Jones and his wife, people of excellent character, and whose testimony is entitled to credit, to whom the testator perhaps talked and gave vent to his insinuations and suspicions with more freedom than any other, regarded his accusations of unchastity as unjust and untrue, and the circumstances which gave rise to them as too inconsistent with her character to be worthy of belief, and express the opinion that she was faithful to her marriage vows and the duties of a wife, and that in view of his conduct, the testator was laboring under a delusion upon this matter.

Stress and importance has been given to this phase of the case, and the evidence, as it is the main starting point of his domestic woes and infelicities, of his suspicions of his wife's infidelity and the illegitimacy of his two children, the contestant and her brother Calvin Jones. It is true that while they lived in Missouri, and in Oregon between 1861 and 1865, their married lives were embittered by estrangements. Much of the time they refused to speak with each other or to conduct themselves in a way calculated to resume confidence and affection; and it was doubtless during some such period, when the cup of their domestic unhappiness was overflowing, that the testator was disposed to give vent to his feelings and indulge in unjust accusations against his wife's chastity in the manner described by some of his relatives. It was about this time when the testator and his wife were estranged and not on speaking terms, although living together as husband and wife, that the conversation with Northcutt took place in which that witness represents him

as inveighing with great temper and acrimony against his wife's marital infidelity. There is no doubt that he was extremely jealous of his wife and entertained a strong suspicion if not conviction of her infidelity and his own dishonor. But this was the time when their domestic troubles were hastening to a culmination which finally ended in separation. When they arrived in Missouri after leaving this state, in 1865, Mrs. Wright, one of the daughters, gives an account of the separation of the testator and her mother. She heard her mother say to her father: "You have brought me here with the intention of leaving me here"; and father said: "No, I did not; if you want to go to Oregon with us, you can." And that her mother said she was going to Ohio. That as to the children, "he gave us the choice to stay or go with him"; that "mother left us and went to Ohio with Libby Potter (the contestant) and shortly after that we started for Oregon." Mrs. White, the other daughter, testified to the same substantially. The contestant remembered "that her mother and father had a conversation after they went back to Missouri about separating." She does not know the cause of it, except that she thought they were in bad humor, nor had she ever heard of any insane delusions or insanity on the part of her father until after his death, and heard that from her attorneys. Nor does she remember that she ever heard her mother say anything about it. She remembers that her father was not given to caressing his children—never caressed her nor repulsed her; thinks she disliked her father at the time her mother left him, and remembers that she preferred to go with her mother when she left her father in Missouri and went back to Ohio; that she slept with her mother and father on the trip, at the foot of the bed; that he never whipped or abused her; that she saw him whip one of the children; that her father gave her mother some money when they left for Ohio, but does not think it exceeded three hundred dollars; that her mother received notice of the divorce proceedings in Oregon while she was living in Ohio; that neither her mother nor the

contestant ever lived with their father afterwards; that she is married and has two children and is in good circumstances and now resides in Missouri.

The evidence shows that the testator and his other two daughters returned to Oregon and finally settled in Clackamas county and lived there until his death in 1887. The subscribing witnesses to the execution of the will were old acquaintances living in the neighborhood, who had traded with him, hunted and traveled together, had visited at his house, attended school-meetings together, met at the stores and other places, and they concur in the opinion that his mind was sound and free from all disturbing influences when he executed his will; that he mentioned the portions to be given to each of the children and betrayed no bad humor or anything to indicate that he was not rational; that he understood his business and the property he possessed and how he wished to have it distributed. His physicians, who had known him for years and who attended him, also express the opinion that he was rational, knew what he was doing, and how he was doing it, and that he was competent at the time to execute a will, and that it was the product of his own free agency. They did not interrogate him in respect to his family matters; they never had had any conversation with him on this subject, and perhaps knew nothing about it, and only think from what they saw and observed that his mind was free from any disturbing influences, and that when he executed his will that he knew and understood what he was doing.

The evidence also shows that during the last twenty years, from the time he returned to Oregon until his death, he acquired property, was industrious and frugal, was a man of good judgment and business sagacity, attended to his own affairs, dealt extensively with numerous persons, took a proper interest in neighborhood matters, lived to a ripe old age (passed three score and ten), and with the children about him who had chosen to remain with him, made his will giving his property to them. His reasons for disposing

of his property in the manner he did and of excluding the contestant from his bounty, is, taking the statement of the witnesses together for brevity, that he had given to the contestant and her mother the share to which they were entitled when they separated; that he understood his daughter, the contestant, was married and had a good home; that he told the children that all of them that wished to remain with him to do so and that they did so except the contestant, but that he said nothing about her illegitimacy, but that he had made up his mind that those who had remained with him and helped to earn it ought to have the benefit of it. Referring to the fact that he wished to will to his wife and the contestant one dollar, as he did when the will was executed, he was asked why do you intend to make your will in that way, and he said: "The reason is very simple. When I left Missouri the children all went with me except her, and I gave her (his wife) some money. And I came back here and the children — I have made all that I have got now by my own hands, me and the children here, and that is the reason." That he was in good humor,— did not seem to be annoyed,— but felt that the children who had remained with and helped him to earn the property which he had acquired were the rightful objects of his bounty and justly entitled to it under the circumstances.

The evidence also shows that at the time mentioned he was as firm in the suspicion or belief that his son Calvin Jones was illegitimate as the contestant, and that he had indicated such belief by much more emphatic language than he had ever indulged of the contestant, yet he did not exclude him from his share of the estate, but provided for him the same as he did the other children, guided by the principle that those who had remained with him and helped to accumulate the property which he was entitled to dispose of were the proper recipients of his bounty, and its application included his son Calvin, whom he had denounced in the days of his domestic troubles, and just before the

separation from his wife as a "tow-headed bastard." In this review, it will be seen nearly all the important facts in reference to his declarations of his wife's infidelity and the illegitimacy of the two children extend back nearly a quarter of a century, when their lives were embittered by estrangement, and their paths rapidly diverging, which was soon to terminate in final separation and divorce. The latest evidence of real importance is Mrs. Jones', which occurred about the time he procured his divorce in 1872, in which he reiterated his belief in his wife's infidelity and exhibited much temper in its asseveration. As to the circumstances upon which he predicates his belief in the infidelity of his wife and the illegitimacy of the two children, there is no evidence of their existence other than his declarations as stated by the witnesses; but we think the evidence shows that the testator believed that his wife was unfaithful to him, and so expressed himself to those whom he could talk with upon the subject as late as Mrs. Jones' evidence, to which we have just referred. After this, there is little or nothing heard of it, and that of little consequence, and when he did refer to them just before making his will, it was without temper, or reference to his former suspicions or accusations, and by his conduct indicating that his sense of injury was apparently healed over and its effects passed away.

The important question for our decision now is, was his belief in the infidelity of his wife and the illegitimacy of the two children an insane delusion, and if so, was he so affected by such delusion at the time of the execution of his will as caused him to deprive the contestant of all benefit in his estate? This necessarily leads to the inquiry: What is an insane delusion?

Sir John Nicholl, in the celebrated case of *Dew* v. *Clark*, 3 Add. Eccl. 79, defined "insane delusions" in these words: "Wherever the patient once conceives something extravagant to exist, which still has no existence whatever but in his own heated imagination, and wherever at the same time,

having so conceived, he is incapable of being, or. at least of being permanently reasoned out of the conception, such a patient is said to be under a delusion, in a peculiar, half-technical sense of the term, and in the absence or presence of delusion, so understood, forms, in my judgment, the true and only test or criterion of present or absent insanity." In *Boughton* v. *Knight*, 6 Moak's Eng. Rep. 349, Sir John Hannen adopted this definition and expressed the belief that it would solve most if not all of the difficulties which arise in investigations of this kind. In *Banks* v. *Goodfellow*, L. R. 5, Q. B. 560, COCKBURN, C. J., says: "When delusions exist which have no foundation in reality and spring only from a diseased and morbid condition of the mind, to that extent the mind must necessarily be taken to be unsound." Chief Justice DENIO said: "If a person persistently believes supposed facts which have no real existence except in his perverted imagination, and against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, he is, so far as they are concerned, under a morbid delusion; and delusion in that sense is insanity." (*Seamen's Friend Society* v. *Hopper*, 33 N. Y. 624; see also 11 Am. &. Eng. Ency. 107, "Insanity.") The belief of facts which no rational person would have believed, is insane delusion. (1 Wms. Exrs. 35; Redf. on Wills, 71.) And in a late case, *Middleditch* v. *Williams*, 45 N. J. Eq. 726, VAN VLEET, vice ordinary, said that "according to these definitions, it is only a delusion or conception which springs up spontaneously in the mind of a testator, and is not the result of extrinsic evidence of any kind that can be regarded as furnishing evidence that his mind is diseased or unsound; in other words, that he is subject to insane delusions. If, without evidence of any kind, he imagines or conceives something to exist which does not in fact exist, and which no rational person would in the absence of evidence believe to exist, then it is manifest that the only way in which his irrational belief can be accounted for is that it is the product of mental disorder. Delusions

of this kind can be accounted for upon no reasonable theory except that they are the creations of the mind in which they originate."

Tested by these definitions, can it be said, upon the facts as disclosed by this record, that the testator was beset with an insane delusion in respect to the legitimacy of the contestant and her brother? The circumstances which he relates, and upon which his belief is founded, fix the place, identify the person and the manner of the improper meeting, and there is no evidence to show, nor is there any attempt to deny, that there was such a place or person or that such a meeting might not have occurred, only that the adulterous purpose which he ascribed and professed to believe to be the object of such meeting was so absolutely inconsistent with her known character for chastity as to be utterly unworthy of belief and only to be accounted for in him upon the theory of an unnatural dislike or aversion which amounted to an insane delusion. The evidence in contradiction of his belief proceeds on the assumption that there may have been such a place and man and meeting; and if so, her known character for chastity, her every-day walk and life, render it impossible that it could have occurred for the foul purposes which he imputes, or otherwise than accidentally and without concert or evil design in thought or deed. But these facts, however falsely or unjustly he may have reasoned from them, or however absurd his conclusions, as applied to the wife and contestant impugned by them, nevertheless furnished the evidence which inspired his suspicions and the ground upon which his belief was founded. It is conceded that the conclusions he drew from the facts are wholly unwarranted and without any justification, indicating at least an unrelenting jealous disposition; but unjust and absurd as they may be, they were not the pure creations of a perverted imagination, without any foundation in reality. Delusions are conceptions that originate spontaneously in the mind without evidence of any kind to support them, and can be accounted for on no reasonable hypothesis. The

mind that is so disordered imagines something to exist or imputes the existence of an offense which no rational person would believe to exist or to have been committed without some kind of evidence to support it. They are as baseless as the fabric of a dream conjured into existence by a disordered or perverted imagination, without any sort of foundation in fact. As in *Smee* v. *Smee*, L. R. 5 Prob. Div. 84, the testator imagined himself to be the son of George IV, and that when he was born a large sum of money had been put in his father's hands for him, but which his father, in fraud of his rights, had distributed to his brothers; or, as in *Smith* v. *Sebbitt*, L. R. 1 Prob. Div. 398, the testatrix imagined herself to be one of the persons of the Trinity, and her chief legatee to be another. In cases like these the belief is the offspring of a disordered mind, and not induced by the existence of any facts or occurrences which could lend any sort of countenance to it. The case at bar is not such. Here there is a claim of facts upon which the belief is founded, and unjust and unfeeling as may be such belief, in view of the known character of his wife for chastity, it is not the spontaneous product of pure fancy, but a grave error, showing a lack of judgment or a want of reasoning powers—the outcome of an over-sensitive, jealous disposition, prone to exaggerate any trifling circumstance with which his wife may be connected into an unworthy and wicked importance, and to draw from them conclusions untenable, illogical and unworthy of belief. There is no doubt that the testator was extremely jealous of his wife, and, like all such, disposed to magnify any act or trifling occurrence into undue importance and to make it the occasion to draw unworthy conclusions of her marital integrity. The experience of mankind has demonstrated that a wife may have a spotless character; she may be justly regarded in the estimation of her friends as without moral blemish and worthy of all confidence and affection; and yet it might happen to her to do some trivial act which would pass unnoticed by them or any one except the argus eyes of an ever-watchful and jealous husband,

who would stand ready to draw base conclusions from it derogatory to her chastity and character. To minds thus constituted, sometimes even a look of the wife, or perhaps a facetious or inadvertent remark, or some insignificant circumstance with which she may be associated, although it be wholly innocent, excites their distrust and fills them with jealous rage; for it is as true now as when first uttered that "Trifles light as air, are, to the jealous, confirmations as strong as proof of holy writ."

To support the contention for the contestant, the belief or suspicion the testator entertained of his wife's infidelity and the illegitimacy of the children to be an insane delusion, must have been wholly without foundation in reality, and the mere figment of his perverted imagination. But the evidence discloses that it was formed on an apparent cause, leading on his part to a view of his wife's conduct, which we have admitted was erroneous, unjust and unnatural, yet this only shows an unfortunate error of judgment or a want of reasoning power, but not an absolute want of intellect upon the subject. The conclusion which he drew from the facts was untenable and erroneous, and showed that he formed a bad judgment upon an insufficient state of facts, but does not show that his conclusion or belief was formed without any foundation in fact whatever.

But even if we assume that his belief was utterly groundless and without any cause, actual or apparent, to justify it, would that authorize us, in view of the circumstances of this cause, to declare the testator was the victim of an insane delusion? In the *Will of Cole,* 49 Wis. 181, LYON, J., said: "It must be conceded that the belief of the deceased in respect to the unchastity of his wife, persisted in as it was without evidence to support it, and against all reasonable probabilities of its truth, looks very much like insane delusions. Yet it is not necessarily so. Observation teaches us that there is a very large class of people whose sanity is undoubted, who are unduly jealous or suspicious of others, and especially of those closely connected with them, and

who upon the most trivial, even whimsical grounds, will wrongfully impute the worst motives and conduct to those in whom they ought to confide. This insanity, which is developed in a great variety of forms, is altogether too common, and too many persons confessedly sane are to a greater or less extent afflicted with it to justify us in saying that because the deceased was so afflicted he was insane or the victim of an insane delusion. The line between the unfounded and unreasonable suspicions of a sane mind (for doubtless there are such) and insane delusions is sometimes quite indistinct and difficult to be defined."

Nor is it enough that a delusion may have existed, but its connection with the will must be made manifest and shown to have influenced its provisions before the will can be set aside and declared void.

Nor must it be entirely overlooked in considering this point, that the period of time when the principal witnesses express the opinion that he was the victim of an insane delusion about the chastity of his wife, relates to conduct and conversation and circumstances that occurred many years ago; that he was divorced from his wife in 1872, and that in the year succeeding little or nothing of real importance is ever heard of his suspicions, and when he did speak of her or the contestant in relation to the matter in hand it was with composure or without insinuations against her marital integrity or the legitimacy of the children.

It is necessary, therefore, to show not only that he was the subject of a delusion, an insane hatred or aversion to his daughter, but that it was present when he executed his will, and influenced him in the making of it and in excluding her from its benefits. Upon this point the evidence has already been detailed, and it will be sufficient to briefly advert to it to show that those who were present at the execution of the will, including the subscribing witnesses and his physicians, all concur in the opinion that he was in the possession of all his faculties and free from any mental disturbance impairing his free agency; that he understood

the extent of his property, and specified those among whom he wished it to be distributed. Several other witnesses there' are with whom he conversed just prior to the making of his will which shows his reasons for excluding the contestant and his appreciation of the claims of those upon whom he thought his property ought to be bestowed. Among these were that the contestant was then in good circumstances; that she had separated from him in early life and chose to remain with her mother; that the property he had acquired was earned by himself and those to whom he intended to will it; that they had helped to lighten his burdens, sympathized with him and cheered him in adversity and disappointment, and were partners in its accumulation, the justice of whose claims entitle them to it. Among those to whom he distributed his property was Calvin Jones, whom he had considered, as the contestant, to be illegitimate, in the years gone by, yet he gave him his share, based upon the principle already stated, and which he conceived to be just, and not on account of any belief in his illegitimacy. It would seem, if he had been beset by any delusion of this kind, it would have operated against him, for its effect is to impair free agency and cause the testator to do what he otherwise would not have done but for the presence of such delusion. His conduct before and at the time of the execution of the will is inconsistent with the existence of such delusion. No feeling of hatred or aversion is evinced. His mind acts from a sense of justice and affection which he feels he owes to those who have been his co-laborers, including Calvin; and, influenced by that principle, he distributes his estate accordingly. It may be harsh, and, under some circumstances, cruel to disinherit one child and to distribute the estate among the others, but if the testator be of sound mind and execute his will as prescribed by law, no court can interfere. "It may be contrary to the principles of justice and humanity, its provisions may be shockingly unnatural and extremely unjust, nevertheless, if it appears to have been made by a person of sufficient age to be competent to

make a will, and also to be the free and unconstrained product of a sound mind, the courts are bound to uphold it." (*Middleditch* v. *Williams, supra.*) Sir John Hannen said: "He may disinherit either wholly or partially his children and leave his property to strangers to gratify his spite, or charities to gratify his pride, and we must give effect to his will, however much we may condemn the course he has pursued." (*Boughton* v. *Knight, supra.*) And the considerations which turn the scale in favor of the exercise of this testamentary power which may disregard the claims of kindred, and disappoint their expectations, COCKBURN, C. J., mentioned these: "Among those who as a man's nearest relations would be entitled to share the fortune he leaves behind, some may be better provided for than others; some may be more deserving than others; some, from age, sex, or physical infirmity, may stand in greater need of assistance. Friendship and tried attachment or faithful services may have claims that ought not to be disregarded. In the power of rewarding dutiful and meritorious conduct, paternal authority finds a useful auxiliary; age secures the respect and attention which are its chief consolations." (*Banks* v. *Goodfellow, supra.*) The law is settled that if a testator, competent to make a will, executes it according to law, that it cannot be disturbed for an inequality or unreasonableness in the distribution of his estate. He is under no obligations to devise it equally to his children or otherwise, but may devise it to a stranger. That fact may be considered as a circumstance in determining testamentary capacity, but of itself is not sufficient to set it aside.

Where a delusion exists, and it is shown to have had an influence on the testamentary disposition of the property, as in *Dew* v. *Clark, supra,* consisting of an aversion to kindred, it is usually accompanied "with other signs," says Sir John HANNEN, "which may be relied on to assist us in forming an opinion on that point." In the case at bar we look in vain for them; but in that case it was the extraordinary importance the testator attached to medical electricity as a means

of cure, which he conceived might be applied to almost every purpose. That case well illustrates the existence of a delusion, which consisted in an insane hatred, without even the shadow of a cause, of his child, persisted in through life, and his will being shown to be the direct offspring of this delusion, was set aside and declared void. The facts in that case show that the testator entertained an unnatural dislike for his only daughter, whom he imagined vile and profligate, and whom he treated with the utmost severity, stripping her naked and unmercifully flogging her, and then rubbing her back with brine, compelling her to do degrading work, denying her decent clothes, denouncing her whenever she came in his presence, when she was in fact amiable, of superior natural talents, dutiful and affectionate, indicating that his instincts and affection had become perverted, and his mind a prey to an insane delusion, which had affected his will and cut her off with an inadequate provision. But what possible similitude can the case at bar bear to that case. It is true, the father of the contestant did not caress her, nor does it seem that he did the other children, but he did not repulse her, and she owns that she disliked him, and perhaps justly, but he did not whip her, although he did some of the other children. Nor did he maltreat her or make any display of any unkind feeling. When his wife decided to leave him, and the contestant chose to go with her, he gave them money, and the preponderance of evidence is that he gave them their share of what he then possessed. He does not seem to have been a lovable man; he was sensitive and jealous, and like all such, when brooding over some supposed wrong, indulged in a harsh and cruel judgment against the fidelity of his wife and the legitimacy of two of the children, but his conduct was marked by no course of harsh treatment, no bursts of violence, no display of outrages, or other indignities than we have noticed, and these were only denounced to a few and generally to those in whom he had a right to confide. The truth is, after their separation, as time passed his sense of injury seems to have

gradually healed over and its effects to have passed away; for after this he begins to acquire property, to take an interest in the affairs of his community, and to command the respect and confidence of his friends and acquaintances for his probity and business character, and during all this time so little is said by him to any one of his former grievances or belief that his daughters were not aware of it until the commencement of this trial.

Nor can we find any case upon facts analagous to these in which it has been held fatal to the validity of the will. In a recent case (*Barbo* v. *Rider*, 67 Wis. 598) in which it was held that the appellant was the victim of an insane delusion and mentally incompetent to care for himself or his estate, the evidence showed that his health had been impaired by excessive drinking; that after living happily with his wife for more than twenty years, suddenly and without cause he conceived the idea she had been untrue to him; that she submitted her person to the criminal embraces of a number of men, some of whom she scarcely knew, and that some of these men had begotten children upon her; that he charged her with it and repeated it to all who would listen to him; wrote an incoherent and indecent letter on the subject; became morose and sullen; ceased to take any interest in his family or business, and wandered aimlessly into the fields; that he begged for a division of the property, refused to take medicine and believed that his friends were trying to poison him. As the court said: "No argument is required to prove that such a change in the nature and conduct of Barbo, such unreasonable and unfounded hallucinations respecting the chastity of his wife and his causeless hostility to his family which yield to no reason or persuasion, are sufficient evidence that he is the unfortunate victim of insane delusion." These cases illustrate delusions, but they are essentially different from the case under consideration. While it seems harsh and cruel, so counter to all the feelings of our nature, that a parent should disinherit one of his children and devise his property to the others, or to cut

them all off and devise it to strangers from some unworthy motive, yet so long as that motive, whether from pride or aversion or spite or prejudice, is not resolvable into mental perversion, no court can interfere. Reliance can usually be placed on the affections, independent of the law, which parents have for their children, to recognize their claim in the testamentary disposition of their estate. But while this is so, the law recognizes the right of the testator to leave his property to whomsoever he chooses to bestow it, and in the exercise of this right he may have reasons, satisfactory to himself, why some of his children should enjoy his estate while others are excluded. Some may be more deserving than others, more needful of help for various causes; some may have contributed largely to its acquisition. These and various other reasons may exert an influence in favor of some and in exclusion of others.

The law being so, upon the facts as disclosed by this record, we must give it as our judgment that the will of the testator, sought to be impeached by this proceeding, is valid, and not the product of an insane delusion; and in conclusion, it is perhaps due to say, that whatever suspicions or belief the testator entertained of his wife's infidelity are refuted by this record; that no wife or mother could be guilty of dishonoring the bed of her husband and bastardizing her children, whose reputation for chastity and the domestic virtues was attested by so many respectable witnesses and contradicted by none.

The decree must be reversed and the cause remanded for further proceedings in accordance with this opinion.