# MORGAN v. MORGAN.*

WILLS; DIRECTION OF VERDICT; FRAUD AND UNDUE INFLUENCE; TESTAMENTARY CAPACITY; WHEN REASONABLENESS OF WILL IS A QUESTION FOR JURY; INSANE DELUSIONS; PRESUMPTIONS.

1. Where there is no evidence, direct or circumstantial, tending to show that fraud or undue influence was exercised upon a testator, it is the duty of the trial court to direct a verdict for the caveatee upon issues raising such questions.

*Insane Delusions.*—For a complete presentation of the authorities dealing with the question of what are insane delusions, see editorial note to *Kimberly's Appeal,* 37 L.R.A. 261.

2. A so-called unnatural and unjust disposition of the testator's estate—such as excluding his children from sharing in it—by a will which in its terms and recitals betrays no other indication whatever of a disordered mind or defective memory, cannot properly be submitted to the jury as a circumstance indicative of the want of the necessary testamentary capacity. But where there is other evidence tending to show that the testator labored under an insane delusion at the time of making the will, with respect to a certain person or thing, and the disposition of the estate is in accord therewith, or indicates the effect of such delusion, such provision may become a circumstance to be considered in connection with extrinsic evidence tending to show the existence of such insane delusion. (Citing *Barbour* v. *Moore*, 4 App. D. C. 535.)

3. The mere fact that a testator disclaimed the paternity of children born of his marriage, and disinherited them, carries no presumption that he was suffering from an insane delusion. If he acted under a delusion superinduced by false testimony, of the falsity of which he had no knowledge, it cannot be said he was the victim of an insane delusion. But if he acted under a delusion for which there was no reasonable foundation, or retained a belief which, under the conditions shown, every sane mind would reject or surrender, then it may be said he was the victim of an insane delusion.

No. 1793. Submitted January 20, 1908. Decided February 12, 1908.

HEARING on an appeal from an order of the Supreme Court of the District of Columbia, denying the probate of a will after the trial by jury of issues to determine its validity. *Reversed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from an order denying the probate of the will of Charles R. Morgan, who died in the District of Columbia October 24, 1905. The will was executed and attested by the requisite number of subscribing witnesses on February 23, 1905. The entire estate of the testator, valued at from $6,000 to $7,000, was substantially devised to his two brothers, John R. and Edward F. Morgan, and his sister, Agnes V. Hoppe, for life, with remainder, under certain conditions unimportant to state, to their children or the children of the survivor of them. The fourth item reads as follows: "I make this will with the

full knowledge that I am depriving my two children, Marie Morgan and Harry Morgan, of any share in my estate, but I do so because I do not want them to have one dollar of my property." Noel W. Barksdale was nominated executor.

It appears from the undisputed testimony that the testator had married Fannie E. —————— in 1890, and that three children had been born betwt  n that time and testator's death,— Marie in 1892, Harry in 1898, and Malcolm F. in 1902. Testator and wife separated in October 1902. He sued her for divorce, apparently in that year, charging adultery committed by her with one Mackinard, whom she married after decree. It appears from a part of the decree in that case (that was read by the court to the jury although, by some inadvertence, it is not recorded as having been offered in evidence) that the charge of the complainant had been sustained and the bonds of matrimony dissolved, shortly before the execution of the will. This decree awarded the custody of the three children aforesaid to the mother, and required the testator to pay $30 per month towards their support.

The executor filed a petition for probate of the will, November 6, 1905. After notice in regular form, a caveat was filed by Winfield S. Larner, who had been appointed guardian of the said infant children, on December 6, 1905. Thereupon four issues were framed for trial by jury: (1) Whether the will had been executed and attested in due form; (2) whether, at the time of execution, the testator was of sound and disposing mind and capable of executing a valid deed or contract; (3) was the execution procured by the fraud of Edward F. Morgan, Alice V. Hoppe, or any other person? (4) was the execution procured through the undue influence of Edward F. Morgan, Alice V. Hoppe, or any other person?

The verdict was "Yes" on the first issue; "No" on the second and third; and "Yes" on the fourth

As to the first issue, formal proof was made, and the caveators conceded its sufficiency.

Caveators introduced evidence on the issue of testamentary capacity. By this it was shown that the testator had been taken

to the Government Hospital for the Insane on September 8, 1888, suffering from a form of mania in which there is intense excitement, amounting almost to delirium,—acute mania. He was discharged December 3, 1888, as recovered, and had never been readmitted. This was undisputed. Medical testimony tended to show that in this form of mental disease there is a tendency to recurrence,—especially if there is an hereditary element in the case. At the hospital the mania was ascribed to heat and overwork,—heat exhaustion. The medical witness had seen testator a number of times after his discharge, but saw no manifestation of mania. Saw him last several years before the date of testifying, and seemed then to be in a relatively normal state of mind, though a little worried about his wife's health. The testimony of a niece of testator's mother tended to show that the latter had been in an asylum for the insane in 1867, and again in 1868, and had been finally discharged as recovered in December, 1868. She had given birth to a child after return, and had no violent attack thereafter, though acting queerly. Several witnesses testified to the excited appearance and manner of testator at frequent periods, particularly during the troubles with his wife and the proceedings for divorce. Sometimes praised and at others abused his wife. Said he was fond of his children. After divorce appeared like a sick man; was often worried; sometimes bright, sometimes sad, and sometimes excited. One witness heard him blaspheme the Virgin Mary. He seemed "off on religion." This was from two years to eighteen months prior to his death. Seemed to talk in a rational way afterwards. On the conclusion of this evidence, the caveatees moved an instruction to the jury to return a verdict in their favor on the issues of fraud and undue influence, which was denied, with exceptions reserved.

The caveatees then introduced about forty witnesses, whose testimony tended to show that, from their observation of testator's manner and conduct before and after the execution of the will, he was sane. Among these were the subscribing witnesses to the will, physicians who had treated the testator, and lawyers who had represented as well as opposed him in his litigation.

The testimony tended to show that he had been a witness in the divorce suit, and had borne well the strain of a long and severe cross-examination. It also tended to show that for several years testator had been engaged as a wholesale dealer in mint and horse-radish, which continued until his last illness; and that in the course of it he had some transactions involving considerable sums. Some of these witnesses testified concerning testator's opinion as to the parentage of the three children. This tended to show that he had frequently denied parentage of. the last child, but had recognized the others until shortly before his will was made. About the time of the decree of divorce he told one of his counsel that he did not believe the two older children were his and said he had evidence thereof. Another lawyer testified to intimacy with the testator for years, and said that he had met him on March 4, 1905, and was told the provisions of his will, leaving his property to his brothers and sister, and disinheriting the children. Witness expressed his opinion that this was harsh, and asked the reason. He said he had learned, and was positive, that the last child was not his; that he had believed the others were, but since the divorce men in his employ had told him things they had seen before. On cross-examination he said testator told him that a boy in his employ had told him of other men having had illicit relations with his wife, and that two other men, not members of his family, had told him the same things. Said that before the divorce proceedings ended he was firmly impressed that the last child was not his, and that since the divorce what these men have told him had made him believe that none of the children was his. He told witness what the men had seen, but this was not reported by the witness.

Upon the conclusion of the evidence, the caveatees renewed their motion to direct a verdict on the issues of fraud and undue influence, and were again denied. All four issues were then submitted to the jury, resulting in the verdict heretofore stated.

*Mr. Andrew Wilson, Mr. Noel W. Barksdale,* and *Mr. Michael J. Colbert* for the appellants.

*Mr. J. K. M. Norton* and *Mr. Henry E. Davis* for the appellees.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

1. We find no evidence in the record tending to support the charges, either of fraud or undue influence exercised by anyone in procuring the draft and execution of the will. Whether or not the testator was insane at the time of making the will, or laboring under an insane delusion as regards the paternity of the children, there is no evidence, either direct or circumstantial, from which it could be inferred that he was the victim of fraud or undue influence. The jury should therefore have been instructed, as requested by the caveatees, to return a verdict in their favor on each of those issues. Instead of granting the motion, the court, though intimating some doubt as to the existence of sufficient evidence to warrant it, submitted both issues to the jury upon all the evidence. He also gave a special instruction in behalf of the caveators, relating to the issue of undue influence; and the jury, as we have seen, found for them thereon.

2. Many of the other errors that have been assigned and discussed are subject to the objection made by the appellees, that they lack the precision of specification in the exceptions on which they are founded, that is required by the rules of this court defining the practice in such cases. Without intending, therefore, to be understood as passing any assignment by as immaterial, we shall confine our consideration to such of the errors as we think are not within the objection.

3. The first relates to the special instructions and the general charge given the jury in respect of the effect that might be given to the unreasonableness and injustice of the provisions of the will.

At the request of the caveators, the court gave the following special instructions:

"In order to find the testator, Charles R. Morgan, at the time

of making the will in controversy, not to have been possessed
of the sound and disposing mind contemplated and required by
the law in making such an instrument, it is not necessary that
you should find him to have been either actually crazy or of un-
sound mind, as that expression is ordinarily apprehended or un-
derstood. If you find that said testator, at the time in ques-
tion, was *mentally* incapable of making a disposition of his
property with judgment and understanding with reference to
the amount and situation thereof and the relative claims of
those who should have been the objects of his bounty, you may
find that he did not possess the testamentary capacity requisite
in the making of a will, and may, accordingly, answer the second
issue 'No;' and in considering this question of testamentary
capacity you should take into account the time, manner, and cir-
cumstances of the execution of the will; the nature and extent
of the testator's estate; his family and connections, their con-
dition and relative situation to him; the terms upon which he
stood with them; the claims of the caveators, or any of them,
upon him; the condition and relative situation of the benefici-
aries of the will; the contents of the instrument itself, and the
unnatural character thereof as respects the caveators, or any of
them."

"It is essential to the exercise of the power to make a will,
that the testator be able to comprehend and appreciate the re-
lations to others who might or ought to be the objects of his
bounty; and that no disorder of the mind shall so far poison
his affections, pervert his sense of right, or prevent the exercise
of his natural faculties as to render him incapable of such com-
prehension and appreciation, and to bring about a disposal of
his property, which, if his mind had been sound, would not
have been made."

(3) "In determining the question of a testator's capacity
the jury are at liberty to consider, in connection with all the
other evidence in the case, the character of the will itself, the
beneficiaries thereunder, and those who ordinarily and usually
would have been the objects of his bounty; the jury being in-
structed that the question of capacity always relates to the

capacity of the testator to make the particular will in controversy."

(4) "The jury may consider the nature and character of the will, and, if it be contrary to natural justice, this, with all the other facts of the case, may be considered by the jury in the determination of the question whether the testator was of sound mind."

(5) "In determining the question of the testator's capacity the jury may consider whether or not the claims of the children have been disregarded; and if they find that such claims have been disregarded, they may consider that fact, in connection with all the other facts and circumstances of the case, and give it such weight as, in their sound judgment and discretion, they think it entitled to."

Having referred briefly to the issues of fraud and undue influence, the court then charged the jury as follows:

"But I apprehend you will find the most difficult question to determine under the second issue, as to whether or not this man was of that competency at the time the paper was signed that the law requires of a man to make the character of will that this will is. The law is clear that a man has the right, has the dominion over his property so long as he is in his right sense and of competent age, and can make a will and dispose of his property to whomsoever he pleases. But at the same time, if he makes a will that is unnatural, a will that seems strange, that is one piece of evidence in the case that a jury may consider as to whether or not his mind was right at the time he executed the paper; and that is one of the strong elements in this case that you will have to meet in determining whether or not this was actually the will of a sound mind.

"One word in regard to the position here: It is the law of this land, and it is the law of this District, that a father must support his own minor children. It is not only the law, but it was determined in this case by judicial decree in the divorce case that he should pay to the mother of these children $30 a month, until further order of the court, for the support of these three children,—not the two, but the three of them. They are

all his children legitimately,—that is, legally, I mean. It is
claimed that they are not actually his, that one of them was not
actually his; but there is no pretense here, there is no evidence
here to show, that the other two were not actually his children.
But the law recognized all three of them as his children, and the
decree that the court of equity pronounced in this case re-
quired him to pay $30 a month."

After reading from this decree so much as showed the award
of the children to the custody of the divorced wife, and the di-
rection that complainant shall pay $30 per month for this sup-
port, the court proceeded to say:

"The law required him to support those minor children; the
decree of the court required him to support them, all three of
them; and he did support them—that is, he complied with the
decree—while he was living.

"Now, I do not know of any law that would prevent him from
changing his property by conveyance, selling it, conveying it,
even while that decree was pending; but he still had the moral
obligation upon him, as well as the legal obligation, under that
decree, to support those minor children. He might have con-
veyed all of his property away; he might have sold it; he might
have changed it; but he would still have that obligation on him.
So he might have disposed of his property by will. He had the
right to do it, even in disregard of this moral obligation, and
this obligation that is generally the off-spring of affection from
a parent toward his children. He had a right to dispose of his
property, and disregard that entirely, providing he was of sound
and disposing mind, such as the law contemplates in such cases.
So that I say that you have this predicament of this family,
this condition of affairs to consider and to bear in mind, in
considering the question which is most important in the case,
as to what this man's mental condition was on the 23d day of
February, 1905, when he signed this will."

"It is said in the testimony that this man regarded all his
obligations; that he was a church-going man; that he paid his
debts; that he recognized his duties as a citizen, was the treas-
urer of a citizens' association, and all that. Now, did he regard,

at the time he made this will, the moral obligations, the obligations of a father towards minor children? This is the query that comes to the minds of all of us in considering the question of testamentary capacity. At that time did he regard those things; or was he in such a state of mind that he had quit being a good practical Catholic, as has been testified to, or that he had given up his ideas of citizenship and proper duties; or was his mind diseased by some defect, something that would unbalance his intellect and throw him off, so that he lost his judgment and lost his reason when he was undertaking to dispose of his property and remember those who were or ought to be the objects of his bounty?

"The title, of course, to real estate goes by conveyance, or it goes by descent. A man makes a deed, and he is said to have disposed of his property by conveyance. So, when he makes a will, his property is said to be disposed of by conveyance; but the difference is that the will does not take effect until the man is dead. If there is no will, instantly when the man ceases to live title descends to his next of kin, his heirs,—in this case these three children. So that if there was no will, on the expiration of the life of Charles R. Morgan these three children would have taken the title to that property. His wife no longer was entitled to any of it, because she was divorced. The title would have vested in these three children; and if the conveyance is by will, it takes effect at that same date,—the death of testator.

"The testimony—that is, some of the testimony—also tends to show that the man's mind was profane toward the objects of his worship heretofore. There is another indication for you to consider in considering all this testimony, as to whether that was actually so or not; and if so, whether that did have any effect upon his judgment and capacity to decide fairly and reasonably about his property, and about those who were to have it after he had ceased to live."

Assuming that in every case where the issue of testamentary capacity is involved, the jury, in determining the question, may be permitted to consider what might ordinarily be regarded an unjust and unreasonable provision of a will, as a circumstance in

connection with other facts and circumstances in evidence tend-
ing to show a want of testamentary capacity at the time of its
execution, we think that the foregoing instructions and charge
far exceeded any admissible application of the principle, and
could not have failed to exercise too great an influence upon the
jury. *Barbour* v. *Moore,* 4 App. D. C. 535, 549.

The issues in that case, where the will gave a considerable es-
tate to one child and disinherited another and unfortunate one,
were testamentary capacity, fraud, and undue influence, with
testimony tending to support each. The judgment setting aside
the will was reversed, among other grounds, on account of the
following part of an otherwise unobjectionable charge to the
jury:

"Upon these questions you are to take into consideration, as
an important element either for or against the will, the con-
tents of the will itself, the character of its provisions, the ob-
jects of the testator's bounty, and the reasonableness of the pro-
visions or promises the will makes. You are also to take into
consideration all the circumstances that have been advanced in
evidence by the number of witnesses that have been examined
in your presence."

In passing upon the exception, Mr. Chief Justice Alvey, who
delivered the opinion of the court, said:

"This fact of the contents of the will, we think, was put to the
jury too broadly and without sufficient qualification. The jury
may have supposed, and most likely did suppose, that they were
at liberty, under the instruction, to pass upon the question of
the reasonableness of the provisions of the will, and because
they thought the will unreasonable, they were therefore justified
in finding against its validity. To allow juries this power of
condemning a will because its provisions may not accord with
their ideas of what is right or reasonable would at once greatly
impair, in a most serious way, the invaluable right of the citizen
of making a will. Many wills are deemed unreasonable, but
it can never be tolerated that they should for that cause alone be
nullified by the verdicts of juries."

4. As there must be another trial of the case, it becomes im-

portant to consider under what conditions the apparent unreasonableness and inequality of a will may be submitted to the jury as a circumstance, in connection with other evidence tending to show incapacity, fraud, or undue influence.

A great number of decisions by the courts of the various States might be cited in support of the general proposition that such unreasonableness is a circumtsance to be considered by the jury, but the reports of these rarely set out in words the provisions of the wills in which this unreasonableness is manfested. In one that seems to go the greatest length in that direction it was said in the opinion: "The commonsense of mankind condemns as contrary to natural justice a will which practically disinherits such children, and leaves the bulk of a large fortune to two who have done no more than they to deserve it, and are better able to meet the vicissitudes and struggles of life; and courts and juries have the right to take that fact into consideration in determining the competency of the testator to make the will." *Rivard* v. *Rivard,* 109 Mich. 98, 118, 63 Am. St. Rep. 566, 66 N. W. 681. If the will in that case was unreasonable only in that it made an unequal, and apparently unjust, division of the estate between the testator's children, the doctrine enounced is in conflict with that of *Barbour* v. *Moore, supra.* The question seems never to have been passed on by the Supreme Court of the United States. It is true that it was said in *Barbour* v. *Moore,* that in an otherwise doubtful case the provisions of the will might furnish intrinsic evidence involving it in suspicion and tending to show incapacity; and hence, if apparently unnatural and not consonant with parental affection, would doubtless excite suspicion against it, but is then only a circumstance to be considered with other facts and circumstances. These expressions are substantially taken from the opinion in the case cited in their support, namely, *Davis* v. *Calvert,* 5 Gill & J. 269, 301, 25 Am. Dec. 282. In that case the will was vigorously attacked on the ground of fraud and undue influence as well as mental unsoundness; and the court went on to say that according to the degree of injustice, absurdity, and unreasonableness of the disposition made by the will, it may

tend to raise a reasonable doubt of the necessary sanity of the maker, and of his free agency uncontrolled by some undue influence, in connection with the attending circumstances and conduct of those surrounding the testator. At the same time it was expressly said that then it was only a circumstance, to be considered with other facts and circumstances in evidence, and not *per se* sufficient to justify the setting aside the will. The same general doctrine is asserted in the following cases: *Middleditch* v. *Williams,* 45 N. J. Eq. 726, 730, 4 L.R.A. 738, 17 Atl. 826; *Barker* v. *Comins,* 110 Mass. 477, 483; *Zimlich* v. *Zimlich,* 90 Ky. 657, 661, 14 S. W. 837; *Re Wilson,* 117 Cal. 262, 267, 49 Pac. 172, 711; *Kaenders* v. *Montague,* 180 Ill. 300, 305, 54 N. E. 321; *Aylward* v. *Briggs,* 145 Mo. 604, 612, 47 S. W. 510; *Sturdevant's Appeal,* 71 Conn. 392, 397, 42 Atl. 70.

Cases may be conceived in which, after the introduction of evidence tending to show the exercise of undue influence, and especially when in connection with evidence tending to show mental or physical weakness of the testator, an apparently unnatural and unjust disposition, in some accord with the purpose with which the undue influence may have been exercised, would constitute a circumstance proper for consideration as tending to support the contention of undue influence. Where testamentary capacity is put in issue, written or oral declarations of the testator tending to show mental weakness or the existence of insane delusions are competent evidence; and, for a stronger reason, the provisions of a will containing irrational declarations, or recitals tending to show a want of understanding or memory on the part of the testator in regard to the amount and character of his estate, or to the natural objects of his bounty, would be proper circumstances for consideration as affording intrinsic evidence of incapacity at the very time and in regard to the very matter to which the inquiry is directed.

When a will is deemed unreasonable it should be because it contains some such intrinsic evidence of mental unsoundness, insufficient memory, or insane delusion, other than the mere presumed unjust or unequal distribution made therein of the

estate. In other words, where the fixed purpose of the testator is stated in rational language, indicating no want of knowledge or memory in respect of his estate, his family, or the ordinarily natural objects of his bounty, the mere fact that he has exercised his lawful power to disappoint the reasonable expectations of those nearest him, and the natural and proper objects of his bounty in the opinion of the community, and has therefore done an apparently unnatural and unjust thing, is not to be regarded as unreasonable in the sense of evidencing mental incapacity.

Differing in policy from the Roman law, ours has always recognized the right of a testator to disinherit those who would take his estate in case of intestacy; and whatever public opinion may, from time to time, be in respect of that policy, it is given effect to in the statutes governing in this District. Whatever the policy of the law permits as reasonable and just ought not, therefore, to be denounced as unreasonable, and declared a circumstance from which want of testamentary capacity may be inferred.

The jury trying the issue necessarily know the contents of the will, and are likely enough to be influenced, to some extent, by their sense of its apparent injustice, without being charged to consider such a provision as a circumstance, in connection with other independent facts and circumstances introduced in evidence, in their determination of the issue. Neither courts nor juries are invested with the power to change or disregard a rule of public policy recognized by legislative authority. Our opinion is that, while the policy of the law of wills remains unaltered by legislative enactment, a so-called unnatural and unjust disposition of the testator's estate by a will that in its terms and recitals betrays no other indication whatever of a disordered mind or defective memory cannot be submitted to the jury as a circumstance indicative of the want of the necessary testamentary capacity. Where, however, there is other evidence tending to show that the testator labored under an insane delusion, at the time of making the will, with respect to a certain person or thing, and the distribution made of the

estate is in accord therewith, or indicates the effect of such delusion, then, as in the case of undue influence before mentioned, such provision may become a circumstance to be considered in connection with the extrinsic evidence tending to show the existence of such insane delusion.

5. This brings us to the consideration of the last errors assigned on exceptions taken to parts of the charge relating to monomania and insane delusions of the testator. These will be stated and disposed of together. At the request of the caveators the following special instructions were given to the jury:

"III. As respects the testamentary capacity of the testator, you are instructed that what you are to consider is his capacity to make the particular will in controversy; and if you find from the evidence that the mind of the testator, at the time of making the will in controversy, was so disturbed or affected that his reason and judgment became lost in respect of considering the natural objects of his bounty to such an extent as to render him unable, fairly and justly, to consider the natural claims upon him of those who should have been the objects of his bounty, you are instructed that he did not possess the necessary testamentary capacity to make a will; and in considering whether the mind of the testator was so disturbed or affected, as is above assumed, you should consider, *in connection with all the other facts in the case,* his domestic relations, especially during the few years preceding his death and the making of the will in controversy; and if you find that such relations caused in the testator a bitterness or aversion towards his wife, of such a character and to such an extent as to amount, in effect, to a monomania on the subject, and so to possess his mind as to make the said bitterness or aversion dominant over him when considering his children and their natural claims upon him as the objects of his bounty; and if you also find that, when about to make the said will, the testator would have made it in favor of his children but for the belief, *arising from such alleged monomania,* that he could not do so without his wife's obtaining possession and control of such property as he might, by his will, leave to his children,—then you should find that the testator

did not possess the requisite testamentay capacity to make the will in controversy, and should, accordingly, answer the second issue 'No.' "

"XII. If the jury believe that the testator was laboring under a monomania concerning his wife, and that his will disinheriting his children was the direct offspring of such monomania, then the jury is instructed that the will must be regarded as invalid, even though the general capacity of the testator to do ordinary business be unimpeached, provided such monomania so affected the testator in making his will as to show him to be of unsound mind in that particular."

The caveatees excepted to the foregoing instructions, because monomania was not defined, and because there was no evidence in the case to which they were applicable.

Thereafter the court charged the jury further as follows:

"Now, one further word: The word 'monomania' has been used in some of the instructions and in the argument of counsel; and in order that you may have a clear idea as to the meaning of that word, I will say that Webster defines it as derangement of the mind in respect to a single subject only; also such a concentration of interest upon one particular subject or train of ideas as to show mental derangement of the mind in regard to a single subject. Another definition given in the law is that monomania is insanity in which there is a more or less complete limitation of the perverted mental action to a particular field, as a special delusion or an impulse to do some particular thing, though the other mental functions may show some signs of degeneration.

"There has been some evidence tending to show a delusion of this kind with reference to the two older children,—the claim, at least, made by the testator that they were not his children. But there is not a syllable of evidence in the testimony, there is not a syllable of evidence, to support any such conclusion as that, if he had it. I do not say that he had any such delusion, but there has been some claim here that he said so, that he claimed that they were not his children, or he was in doubt as to whether they were his children or not. There has not been

any evidence upon that subject here at all; and I only put those definitions before you so that you may clearly understand what is meant by counsel here in referring to monomania and delusions that might affect the making of this will."

The caveatees excepted to this charge as to there being no evidence to show that the two older children were not the testator's, "for the reason that it makes no differnce whether they were or not, if he believed there was any doubt about it."

Whether the definition of monomania as contained in the foregoing is correct, in the abstract, it is immaterial to consider.

If the testator was affected with monomania at all, under the testimony before the jury it must have consisted of an insane delusion as regards the paternity of the two older children who are expressly disinherited.

Insane delusion has been well defined by the supreme court of California as follows: "In ordinary language a person is said to be under a delusion who entertains a false belief or opinion which he has been led to form by reason of some deception or fraud, but it is not every false or unfounded opinion which is in legal phraseology a delusion, nor is every delusion an insane delusion. If the belief or opinion has no basis in reason or probability, and is without any evidence in its support, but exists without any process of reasoning, or is the spontaneous offspring of a perverted imagination, and is adhered to against all evidence and argument, the delusion may be truly called insane; but if there is any evidence, however slight or inconclusive, which might have a tendency to create the belief, such belief is not a delusion. One cannot be said to act under an insane delusion if this condition of mind results from a belief or inference, however irrational or unfounded, drawn from facts which are shown to exist. 'An insane delusion is not only one which is error, but one in favor of the truth of which there is no evidence, but the clearest evidence often to the contrary. It must be a delusion of such character that no evidence or argument will have the slightest effect to remove.' *Merrill* v. *Rolston,* 5 Redf. 252. -* * * 'Delusions are conceptions that originate spontaneously in the mind without evidence of any

kind to support them, and can be accounted for on no reasonable hypothesis. The mind that is so disordered imagines something to exist, or imputes the existence of an offense which no rational person would believe to exist or to have been committed without some kind of evidence to support it.' *Potter* v. *Jones,* 20 Or. 249, 12 L.R.A. 161, 25 Pac. 769." *Re Scott,* 128 Cal. 57, 62, 60 Pac. 527.

Tested by this definition, which has the support of many well-considered cases, the charge was clearly erroneous. In the first place, the testator's opinion of his former wife was immaterial. The question of her conduct had been settled by the decree of divorce which terminated their legal relations. In the second place, it was not in accordance with the facts before the jury to say that there had been some evidence tending to show an insane delusion with respect to his being the father of the two older children, and that there "was not a syllable of evidence to support any such conclusion as that, if he had it." This substantially concedes that he labored under no insane delusion as regards the paternity of the youngest child, born apparently while the divorce suit was in progress. The facts developed in that suit appear to have convinced the testator that he was not the father of the youngest child, and to have tended to raise some doubt in his mind as to the paternity of the two older ones. Then the evidence of his declarations made it to appear that he claimed to have acquired further information, relating to earlier misconduct of their mother, by which he was led to disclaim their paternity also. The source and nature of this information were declared to two persons. The information might have been false, and he might have been largely induced to give credit to it by the undoubted fact of the mother's later misconduct. While, therefore, he might have acted under a delusion, it was not an insane delusion, that is to say, a conception originating spontaneously in the mind, without evidence to support it, and which could be accounted for on no reasonable hypothesis. As was said in a recent case in Pennsylvania: "It is never a question of soundness of view, * * * but the proper inquiry always is whether the party imagined

or conceived something to exist which did not in fact exist, and which no rational person in the absence of evidence would have believed to exist." *Murdock's Appeal,* 185 Pa. 203, 39 Atl. 816; see *Bennett's Estate,* 201 Pa. 485, 490, 51 Atl. 336.

Had there been evidence showing that there was no possible foundation for the impeachment of the mother's chastity before the birth of those children, and that the statements made to the testator of her misconduct were false and had been maliciously made, yet if, in the absence of such proof, the testator believed them to be true and acted under that belief, it still could not be said that he was the victim of an insane delusion. That condition could only be shown by evidence that proof of their falsity, which no sane mind could fairly reject, had been furnished him, notwithstanding which he clung to his unfounded opinion and acted in accordance with it.

There was no such proof, and no evidence whatever tending to show that testator's disbelief in the paternity of the children was the effect of an insane delusion. Yet the effect of the charge was to indicate to the jury that the testator's doubt was evidence of delusion. They were then told that there was no evidence to support the testator's doubt. Plainly, the jury could come to no other conclusion than that the testator labored under an insane delusion as regards the paternity of the two older children. The mere fact that one disclaims the paternity of children born of his marriage, and disinherits them for that reason, carries no presumption of insane delusion. If he act under a delusion superinduced by false testimony, of the falsity of which he has no knowledge, it cannot be said that he is the victim of an insane delusion.

If, on the other hand, he act under a delusion for which there is no reasonable foundation, or retain a belief which, under the conditions shown, every sane mind would reject or surrender, then it can be said that he was the victim of an insane delusion. In the former case the delusion is the product of reason; in the second a figment of the imagination.

There being no evidence tending to show that the testator labored under a delusion, even, much less an insane delusion,

there was no foundation for either the special instructions or the general charge as given to the jury.

For the reasons given, the judgment must be reversed, with costs, and the cause remanded, with directions to set aside the verdict and order a new trial. It is so ordered. *Reversed.*