Argued June 10; affirmed June 23; rehearing denied July 28, 1931

In re Linville's Estate

COPENHEFER *v.* POWERS et al.

(300 P. 505)

*Floyd D. Moore* and *W. L. Cooper,* both of Portland, for appellants.

*T. B. Handley,* of Portland, for respondents.

CAMPBELL, J. On August 20, 1929, Harriet Linville died leaving a will dated August 2, 1929, in which she made a few minor bequests to her son, Ethan Allen Copenhefer, and some other relatives, and left the rest of her estate to a foster daughter, Nora Powers, as residuary legatee who was nominated in the will as executrix. On August 27, 1929, this will was probated in common form, and Nora Powers, the foster daughter and residuary legatee, was appointed executrix. On January 6, 1930, this contest was instituted by the son filing his petition, asking that the will be set aside and that the decedent be declared to have died intestate, on the grounds: 1. That at the time the will was made, deecdent was of unsound mind and mentally incompetent. 2. That the will was made under undue influence exercised by the residuary legatee.

This petition was tried to the circuit court and after a full and complete hearing the court dismissed the contest, sustained the will and admitted the same to probate. Contestant appeals.

It appears that the testratrix in her youth married a Mr. Copenhefer. The issue of this marriage was one son, Ethan Allen Copenhefer, contestant herein. About the year 1893, Mr. and Mrs. Copenhefer took into their home a female child about four weeks of age, to bring up as their own. This girl lived with them as one of the family until her marriage. She was married at the age of eighteen years. The elder Copenhefers accumulated considerable property. At the time of the husband's death, they owned as community property in the state of Washington where they lived, something

over 1,000 acres of land and considerable personal property. The husband died in the year 1906. The family continued to live together and worked the farm up until the foster daughter married and moved into a home of her own. The son continued to live with his mother until his marriage when he also moved into his own home. About 1911, the family decided to give up farming and sold off the farming utensils and equipment and moved to Portland. The mother owned a house and lot in the town of Dallas and 160 acres of timber and brush land in Tillamook county, together with five hundred acres of land which came to her as her share of the community property in the state of Washington. Sometime after the death of her husband, Mr. Copenhefer, the testatrix married a Mr. Falkner who lived only a few years thereafter. She later married a Mr. Linville who died in 1929.

The evidence indicates that the testatrix was a woman of some business sagacity, and of a rather jovial, kind-hearted disposition. She and the son, as lessors, rented the farm property in Washington and seemed to get along well enough with their affairs until 1928, when it appears that she became dissatisfied with the son's conduct of her business affairs. They called in attorneys who adjusted their differences by the mother deeding her farm land to the son for the consideration of a $500 annuity during her life. This agreement appears to have been carried out by the son. She had sometime previous to this deeded to the son her 160 acres of land in Tillamook county and transferred to him her equity in the property at Dallas. On July 12, 1929, she had a partial paralysis that did not affect her to any great extent. On August 3, 1929, she was affected by what the doctors diagnosed as a cerebral embolism which eventually caused her death. Both the

son and the foster daughter seemed to have gotten along nicely with each other as well as with the mother at all times. They treated her with kindness and consideration especially through her last illness. A day or two before the execution of the will, she requested her foster daughter to engage a lawyer and have him come to her house as she wished some legal work done. The foster daughter, not being acquainted with any lawyers, sought the advice of a friend, a Mr. Kester, who suggested that she employ Mr. Handley, They called on Mr. Handley and asked him to go to the home of the testatrix which he attempted to do that evening, but, not having had the correct address, failed to find the place. Mr. Handley seems to have been informed of the purpose of the visit and gave them some legal advice which led them to the conclusion that what was required was a will by the testatrix. The next morning the testatrix had her foster daughter make some notes as to the provisions she wished in her will. These notes were taken to Mr. Handley's office where he prepared a will ready for the signatures and sent it to the testatrix. It seems to have been delivered to her about noon of August 2, 1929. That evening she called in two of her neighbors and in their presence signed the will and declared it to be her last will and testament, and requested them to sign as witnesses thereto. This they did in the presence of the testatrix and of each other. There was no one else in the room at the time the will was executed.

The rule is well settled in this state that "The burden of proof was upon the proponent to establish the testamentary capacity of the deceased": *Hubbard v. Hubbard,* 7 Or. 42; *King v. Tonsing,* 87 Or. 236 (170 P. 319); *In re Sturtevant's Estate,* 92 Or. 269 (178 P. 192, 180 P. 595); *In re Estate of Riggs,* 120

Or. 38 (241 P. 70, 250 P. 753). It is also well settled that "The burden of establishing the allegation that the will in contest was the product of undue influence is on the contestants": *In re Sturtevant's Estate,* supra; *In re Riggs' Estate,* supra. The test of testamentary capacity is: "If the testator at the time of making his will comprehends the nature of the act in which he is then engaged, knows the nature and extent of the property which makes up his estate and which he intends to dispose of, and has in mind the persons who are, should or might be the objects of his bounty, and the scope and reach of the provisions of the written instrument, he has sufficient capacity to make a will": *In re Phillips' Will,* 107 Or. 612 (213 P. 627); *In re Faling Will,* 105 Or. 365 (208 P. 715); *Clark v. Clark,* 125 Or. 333 (267 P. 534).

■ The subscribing witnesses, two reputable citizens, neighbors of testatrix, were called on behalf of the proponent. They testified very positively that the testatrix at the time of signing the will was mentally sound and competent. That she understood what she was doing and informed them that the will was just as she wanted it. They knew her well and saw her very frequently during the prior three years. They are disinterested in the result of this litigation and, while not expert alienists, their evidence is not to be lightly considered: *Clark v. Ellis,* 9 Or. 128. Then there was the testimony of Mr. Rossier, a banker of Bickleton, Washington, near testatrix's residence while she lived on the farm and with whom she had considerable business and in whom she had confidence. He testified that she had informed him of the final disposition she intended to make of her property and this information was in accordance with the will she finally made. Several other neighbors, friends and relatives, who had known her

for a number of years and had opportunities of observing her mental and physical condition, testified in effect: that she was mentally competent during their acquaintance with her and up until the third day of August, 1929, the time she was afflicted with cerebral embolism. There is also the testimony of Nora Powers, the residuary legatee, but she is an interested witness.

■ Opposed to this testimony is that of the contestant and his wife and some other neighbors, but the appellant is relying principally on the testimony of three medical experts. The principal medical expert relied on by the contestant was Dr. D. C. Burkes, a professional alienist. This witness never saw the testatrix and his testimony is in answer to a hypothetical question propounded by counsel for contestant. This hypothetical question is based largely on the testimony of contestant and his wife. If this were the only testimony, a layman would arrive at the same conclusion as the expert. Expert testimony, when predicated upon a hypothetical question based on the observations and testimony of an interested non-expert witness is of slight probative value. The other two doctors only inferentially covered the time of executing the will: *Wendl v. Fuerst*, 68 Or. 283 (136 P. 1).

In addition to the testimony offered tending to prove testatrix's testamentary capacity, there was introduced another will executed in August, 1928, a time when all the parties agree that she was mentally competent, making practically the same disposition of the property as was made by the will under contest. There were a few slight changes and very minor gifts to one or two in the last will who were not mentioned in the first, but the disposition of the property was the same, which must be considered as strongly tending to show

that her mental capacity at the time of making the last will was equal to that she possessed when she made the one of August, 1928.

■ The only evidence tending to show undue influence is the fact that the residuary legatee had the opportunity and that the will was made favorable to her. This is not sufficient. There must be substantial evidence, either direct or circumstantial, to show that she took advantage of her opportunity. When we take into consideration the final disposition of all of the property, that which was deeded as well as that which was willed, the will is not an unnatural one.

Each one of these cases must stand on its own peculiar facts: *In re Riggs' Estate,* supra.

The court did not err in sustaining the will. The judgment of the circuit court is affirmed.

BEAN, C. J., BELT and BROWN, JJ., concur.