This proceeding was instituted by Martha Virginia Earle, the only child and sole heir at law of Thomas Henry Edwards, deceased, to set aside the will of her father upon the ground of want of testamentary capacity, fraud and undue influence. He died at San Diego, California, on September 16, 1929, at the age of 59 years, leaving an estate estimated to be of the value of more than $400,000. The will was executed on February 21, 1929, and gave to the *Page 643 
daughter the sum of $100 only, and the remainder of his property was given to other persons who had but little, if any, claim upon his bounty. The will was probated in common form on September 20, 1929, and in these proceedings, which are equitable in their nature, the proponents of the will are seeking to have it reprobated in solemn form. The matter was heard before the Honorable George Tazwell, judge of the probate department of the circuit court for Multnomah county, and the trial resulted in a decree sustaining the will, from which the daughter has appealed.
Under the terms of this will, testator gave $100 to his daughter, $100 to Mrs. Laura V. Edwards, his exwife, and to Mrs. Frances E. Murray, his housekeeper, he gave his automobile and personal effects. The remainder of his property, which a short time before he had estimated to be of the value of $460,000, he gave in trust to the Security Savings and Trust Company, a corporation of Portland, Oregon, and, during the life of the trust, he directed the trustee to pay from the net income of all said trust property 1/20 thereof to the Sisters of Mercy; 1/20 to the Sisters of the Holy Name; 2/20 thereof to Albert H. Herndobler during the term of his life and, if his wife survives him, to her during the term of her life, and, upon the death of both Herndobler and wife, to their surviving children born before January 1, 1928, during the term of their life or lives; 5/20 thereof to Adolph G. Sieberts during the term of his life and, if his wife survives him, to her during the term of her life and, upon the death of both Sieberts and his wife, to their surviving children born before January 1, 1928, during the term of their life or lives; 5/20 thereof to his sister, Mary E. Longo, during the term of her life and, upon her death, to *Page 644 
Ann Elizabeth Whiting, her daughter, if she survives her mother, during the term of her life and, upon her death and the death of her mother, to the heirs of the body of Ann Elizabeth Whiting, if she leaves any such surviving her, then to them during the life of the trust; 1/20 to Lauretta C. Schultz during the term of her life; 1/20 to Elaine Hamblin so long as she remains single; 1/20 to Frances E. Murray so long as she remains single; 1/20 to Sanford E. Whiting, Jr., a stepson of testator's sister, during the term of his life; 1/20 to Winnie Landis so long as she remains single; 1/40 to William Tilke during the term of his life, and 1/40 to James Day during the term of his life.
The will provides that the trust to be created thereunder shall continue until the death of the last survivor of certain named beneficiaries, namely: Frances E. Murray, Mary E. Longo, Ann Elizabeth Whiting, Lauretta C. Schulz, Elaine Hamblin, Albert H. Herndobler, his wife and the heirs of her body born prior to January 1, 1928, Adolph G. Sieberts, his wife and the heirs of her body born prior to January 1, 1928, and that, upon the death or disqualification of any of the beneficiaries who were to take under the trust, the bequest to them shall cease and thereafter their share shall be paid proportionately to the beneficiaries who may then be living and not disqualified. The will also contains a provision that "In case Ann Elizabeth Whiting should not survive Mary Edwards Longo and should not leave heirs of her body, the said 5/20 of my net income shall revert to my trust estate." The residuary clause provides that upon the termination of the trust, the trust property shall be distributed 1/20 to the Sisters of Mercy, 1/20 to the Sisters of the Holy *Page 645 
Name, and the remaining 18/20 to the heirs and devisees of Ann Elizabeth Whiting. The will names Herndobler and Sieberts as executors and, pursuant thereto, they have been appointed as such and have accepted the trust.
In a proceeding of this nature the first question for decision is: Upon whom does the burden of proof rest? Formerly, it was the rule in this state that where a will probated in common form was attacked by a direct proceeding seeking to revoke the former probate thereof and to have the will declared invalid, it was incumbent upon the proponents of the will to prove not only the sanity of the testator but every other disputed fact necessary to sustain its validity. See Holman's Will, 42 Or. 345 (70 P. 908), and authorities there cited. That rule, however, was modified in part in Re Sturtevant's Estate, 92 Or. 269, (178 P. 192, 180 P. 595), where it was held that the burden of proof is upon the proponents to establish that the testator was of sound and disposing mind at the time he made the will and that the will was executed in due form, and that when these facts had been established, then the burden of proving the fact of fraud or undue influence is upon the contestant. As so modified, that rule has been adopted and approved in all the later decisions of this court and the fact of fraud or undue influence has since been treated as a counterplea of contestant and, therefore, to be proved as a part of his case: Rice v. Rice, 95 Or. 559
(188 P. 181); Re Estate of Moore, 114 Or. 444 (236 P. 265); In theMatter of the Will of Robert Carr, 121 Or. 574 (256 P. 390); Inre Wayne's Estate, 134 Or. 464 (291 P. 356, 294 P. 590, 79 A.L.R. 1427); Copenhefer v. Powers, 137 Or. 145 (300 P. 505). *Page 646 
It will be seen, however, from an examination of this will that Edwards not only disinherited his only child but also his own grandchildren, if such should be born of his daughter. Such a will is an unnatural will and one which has been termed an inofficious will; that is to say, one in which natural affection and the claims of near relationship have been disregarded. Under this will, the testator gave substantially all his estate to his sister, her daughter, his sister's stepson, who was of no relationship to him, and to persons in his employ. His sister and his employees, who are the principal beneficiaries under the will, all occupied a relationship of special trust and confidence to him. Where such relationship exists between the testator and the beneficiaries and the will, as made, is not consistent with the claims of duty and affection, the rule in this state is that slight evidence that the legatees or devisees have abused the confidence reposed in them would be sufficient to avoid the will.Greenwood v. Cline, 7 Or. 17; In Re Diggin's Estate, 76 Or. 341
(149 P. 73); Re Dale's Estate, 92 Or. 57 (179 P. 274); ReDeHaas' Will, 135 Or. 399 (296 P. 42).
Moreover, the evidence shows that Edwards had a hobby for making wills. Mr. Shively, his attorney, testified that as soon as Edwards had executed one will he commenced to prepare another, and the evidence shows that between August 3, 1920, and February 21, 1929, when this last will was made, he had executed not less than nine wills and that in every one of said wills except the one in question here, he had given a very substantial portion of his estate to his daughter. Hence, we have not only an unnatural will but a sudden change in the attitude of the testator *Page 647 
toward his daughter and an entire departure from a large number of wills previously made. As shown by the testimony to which we will later refer, the testator had been suffering for years from diseases which not only affected him physically but also mentally. Under such circumstances, the making of this unnatural will in favor of persons occupying positions of trust and confidence to himself and his sudden and radical departure from the policy which he had always theretofore followed of providing liberally for his daughter in his wills is some evidence of mental unsoundness, fraud and undue influence. As was said in ReFaling's Will, 105 Or. 365 (208 P. 715): "A marked change in a person's habits and thoughts is evidence of mental unsoundness. Insanity is indicated by proofs of acts, declarations and conduct inconsistent with the character and previous habits of the person: Knapp v. St. Louis Trust Co., 199 Mo. 640 (98 S.W. 70, 78.)."
In this state the law permits the largest exercise of volition in the disposal of property after death, but it requires as a condition that this volition should be exercised by a mind of natural capacity not unduly impaired by old age, enfeebled by illness or tainted by morbid influence or mental perversion. Such a mind, in the language of the law, is "a sound and disposing mind." The right to make a testamentary disposition of property, which the law concedes, is founded upon the assumption that a better disposition will be made by a rational will than can be made by the law itself. The law does not require that the testator shall have a perfectly balanced mind; that is to say, a mind which is free from all influence of prejudices, passion or pride, nor is a man incapacitated for making a will if, *Page 648 
in disposing of his property, he is moved by capricious, frivolous, mean or even bad motives. Under the law, every person of sound mind is left free to choose the person upon whom he will bestow his property after death, entirely unfettered in any selection he may think proper to make. "He may," as has been said, "disinherit, either wholly or partially, his children, and leave his property to strangers to gratify his spite, or to charities to gratify his pride, and we must give effect to his will, however much we may condemn the course he has pursued."Boughton v. Knight, 3 L. Rep. (Courts of Probate and Divorce), 64. But the power to so dispose of property is upon the condition that the testator has a sound and disposing mind, and, unless such condition exists, the will is invalid. The testator must have a memory to recollect the several persons who may be fitting objects of his bounty and an understanding to comprehend and appreciate their relationship to him and the claims to which he ought to give effect. He must also understand the nature and effect of the act in which he is then engaged and understand or have the capacity to understand the property he is about to dispose of. Our latest decision upon this question is Copenheferv. Powers, 137 Or. 145 (300 P. 505), where, after citing numerous cases, this court said:
"If the testator at the time of making his will comprehends the nature of the act in which he is then engaged, knows the nature and extent of the property which makes up his estate and which he intends to dispose of, and has in mind the persons who are, should or might be the objects of his bounty, and the scope and reach of the provisions of the written instrument, he has sufficient capacity to make a will." *Page 649 
However, as was truly said by Lord Chief Justice Cockburn inBanks v. Goodfellow, Law Rep. 5 Q.B. 549:
"It is essential to the exercise of such a power (the making of a will) that a testator shall understand the nature of the act, and its effects; shall understand the extent of the property of which he is disposing; shall be able to comprehend and appreciate the claims to which he ought to give effect, and with a view to the latter object that no disorder of the mind shall poison the affections, pervert his sense of right, or prevent the exercise of his natural faculties, that no insane delusion shall influence his will in disposing of his property, and bring about a disposal of it, which, if the mind had been sound, would not have been made. Here, then, we have the measure of the degree of mental power which should be insisted on. If the human instincts and affections, or the moral sense, become perverted by mental disease, if insane suspicion or aversion take the place of natural affection, if reason and judgment are lost, and the mind becomes a prey to insane delusions calculated to interfere with and disturb its functions, and to lead to a testamentary disposition, due only to their baneful influence, in such a case it is obvious that the condition of testamentary power fails, and that a will made under such circumstances ought not to stand."
Before discussing the testimony, we think another principle of law applicable under the facts of this case should be stated. It is contended by the contestant that at the time this will was executed Edwards was under a morbid or insane delusion that his daughter no longer loved him; that she had voluntarily left him and was lost to him forever. That he had such a delusion and was influenced by it and made a different testamentary disposition of his property because of it, and that he was sane in most, if not all, other respects we think is clearly established by the testimony. *Page 650 
It seems to be a well-settled principle of law that an insane delusion will not incapacitate a person from making a valid will unless the delusion directly affects the testamentary act itself. But that if it does, then the will is invalid no matter how sound the mind of the testator may have been in all other respects. InBanks v. Goodfellow, supra, the court stated the question for decision to be:
"* * * whether partial unsoundness, not affecting the general faculties, and not operating on the mind of a testator in regard to the particular testamentary disposition, will be sufficient to deprive a person of the power of disposing of his property."
In disposing of that question, the court said:
"* * * The pathology of mental disease and the experience of insanity in its various forms teach us that while, on the one hand, all the faculties, moral and intellectual, may be involved in one common ruin, as in the case of the raving maniac, in other instances one or more only of these faculties or functions may be disordered, while the rest are left unimpaired and undisturbed; * * * there often are, on the other hand, delusions which, though the offspring of mental disease and so far constituting insanity, yet leave the individual in all other respects rational, and capable of transacting the ordinary affairs and fulfilling the duties and obligations incidental to the various relations of life. No doubt when delusions exist which have no foundation in reality, and spring only from a diseased and morbid condition of the mind, to that extent the mind must necessarily be taken to be unsound; just as the body, if any of its parts or functions is affected by local disease, may be said to be unsound, though all its other members may be healthy, and their powers or functions unimpaired. But the question still remains, whether such partial unsoundness of the mind, if it leaves the affections, the moral sense, and the general power of the understanding unaffected, *Page 651 
and is wholly unconnected with the testamentary disposition, should have the effect of taking away the testamentary capacity."
And it was held that delusions which arose from mental disease, but were not calculated to prevent the exercise of the faculties essential to the making of a will, or to interfere with the consideration of the matters to be weighed and taken into account on such an occasion, and which delusions had no influence on the testamentary disposition in question, were not sufficient to deprive one of testamentary capacity.
In Fraser v. Jennison, 42 Mich. 206 (3 N.W. 882), in a decision written by Judge Cooley, the court said:
"It is not an uncommon impression that a will must be set aside whenever the existence of any mental disorder at the time of its execution is established. Waring v. Waring, 6 Moore's P.C. Cas., 349. That this is not the law is apparent from the fact that the testamentary dispositions of monomaniacs are often sustained in spite of the mental disorder. When the monomania is conceded, it is only necessary to inquire further whether the provisions of the will are or are not affected by it, and the will stands or falls by that test. Dew v. Clark, 1 Add. Ec., 279; 3 Add. Ec., 79; Dunham's Appeal, 27 Conn., 192; Lucas v. Parsons,24 Ga., 640; Boardman v. Woodman, 47 N.H. 120; Crum v. Thornley,47 Ill., 192; Thompson v. Kyner, 65 Penn. St., 368; Benoist v. Murrin,58 Mo., 307; Banks v. Goodfellow, L.R. 5 Q.B. 549; Pidcock v. Potter, 68 Penn. St., 342. A man may believe himself to be the Supreme Ruler of the Universe, and nevertheless make a perfectly sensible disposition of his property, and the courts will sustain it when it appears that his mania did not dictate its provisions."
The rule in this state is that, in order to show that testamentary disposition has been affected by insane delusions, it must appear that the testator's delusions *Page 652 
in some manner entered into the making of his will. The holding of delusions does not of itself constitute testamentary incapacity but affects testamentary capacity only when it enters into or controls in some degree its exercise: In re Sturtevant'sWill, supra; In re Heaton's Will, 224 N.Y. 22 (120 N.E. 83).
It is clear from the reading of this will that Edwards, when disinheriting his daughter, was acting under the belief that his daughter no longer loved him, and that she occupied no better position in his mind than that of a mere stranger. This belief, if well founded or if based upon any evidence whatever, might perhaps be held to explain his motive for disinheriting her but it could hardly be held to be a sufficient ground for disinheriting her children. To disinherit his own grandchildren because of the supposed fault of their mother, whether such supposition was well founded or not, is in itself alone some evidence of a diseased mind, for it is hardly conceivable that any rational mind would disinherit his own grandchildren, who, when born, would be his sole descendants, because of some supposed fault of their mother. That he had the legal right to do so, however, if no disorder of the mind had poisoned his affections and perverted his sense of right, or prevented the exercise of his natural faculties, or if no insane suspicions or aversions had taken the place of natural affection and if his reason and judgment were sound, is clear.
This leads to the consideration of what constitutes an insane delusion. The term "delusion" as a test of insanity has variously been defined, but no satisfactory definition applicable in all cases and under all circumstances has been found. In common parlance, a man may be said to be under a delusion when he only *Page 653 
labors under a mistake, but this affords no legal test. InPotter v. Jones, 20 Or. 239 (25 P. 769, 12 L.R.A. 161), Mr. Justice LORD, with his usual clearness and accuracy, attempted to define what constitutes an insane delusion, one of which definitions he quotes with approval from Dew v. Clark, 3 Add. Eccl. 79, as follows:
"Wherever the patient once conceives something extravagant to exist, which still has no existence whatever but in his own heated imagination, and wherever at the same time, having so conceived, he is incapable of being, or at least of being permanently reasoned out of the conception, such a patient is said to be under a delusion, in a peculiar, half technical sense of the term, and in the absence or presence of delusion, so understood, forms, in my judgment, the true and only test or criterion of present or absent insanity."
Another definition given in that case is as follows: "Delusions are conceptions that originate spontaneously in the mind without evidence of any kind to support them, and can be accounted for on no reasonable hypothesis." They have no foundation in reality and spring from a diseased or morbid condition of the mind. Another definition elsewhere given is "a pertinacious adhesion of the patient to some delusive idea in opposition to plain evidence of its falsity," and one which, when conceived, the patient is unable of being permanently reasoned out of.
It appears from the record in this case consisting of 3,300 pages of testimony in addition to 600 exhibits, that Edwards was born in Portland, Oregon, on September 14, 1870, his father being of Welsh and his mother of Irish ancestry. He attended a parochial school at Montreal and later took a course in civil engineering at the Rensselaer Polytechnic Institute at Troy, New York, graduating therefrom in 1891, but he never followed that profession. His father owned *Page 654 
and conducted a retail furniture store in Portland under the corporate name of Edwards and Company for whom testator worked until his father's death in 1913. During that time he also studied law but whether or not he was admitted to practice we do not know from the evidence. At any rate, he never practiced that profession. Under his father's will, the capital stock of said company and his other property passed in equal shares to testator and his sister, then Mrs. Mary E. Merges, later Mrs. Mary E. Whiting, and now Mrs. Mary E. Longo. Shortly thereafter testator purchased from his sister her part of the capital stock and, until his death, he had control of the corporation. The business of the store was profitable and testator invested the profits thereof in stocks and bonds, some of which he held at the time of his death. While a student at Troy, New York, testator met and became engaged to marry Laura V. Curtis. They were married in 1895 and contestant, their only child, was born on July 6, 1905. About 1900 Mrs. Edwards inherited $10,000 from her father's estate, which she gave to testator and with it he purchased in his own name their home and a garage property in Portland. So far as the evidence shows their marital relations were always pleasant until 1926, when he insisted upon his wife getting a divorce from him, which she did contrary to her own wishes. During that year the Portland home was sold and, from the proceeds of the sale, she received $5,000. After that they lived separate and apart, she in Los Angeles and he in San Diego, California.
As a property settlement between himself and his wife, he first agreed to place in trust securities of the value of $100,000 and to provide in the trust agreement that she should receive from the net income *Page 655 
thereof, or from the corpus of the trust if necessary, $500 per month for her maintenance and support during the term of her life. This agreement was later modified by mutual consent, whereby it was agreed that securities of the value of $90,000 only should be placed in trust and that Mrs. Edwards was to receive $300 and the daughter should receive $100 per month during the term of their natural lives, and that upon the death of the survivor, the property placed in trust should pass to the heirs or legatees of the daughter. One of the grounds which he urged to induce Mrs. Edwards to accept such property settlement was that he wanted to be free to leave the remainder of his property upon his death to his daughter.
Pursuant to their agreement, Mrs. Edwards obtained an interlocutory decree of divorce on August 31, 1927, and by the terms thereof he was required to pay $500 per month for her maintenance and support. He made said payments until October 31, 1928, when the property settlement contract was performed by his depositing in trust with the Security Savings and Trust Company, one of the proponents herein, securities of the value of $90,000, since which time Mrs. Edwards has received from the trustee $300 and the daughter $100 per month. That trust and the one created by this will are wholly different trusts and have no relation whatever to each other. We have referred particularly to this separation, divorce and property settlement agreement because of proponents' contention that, in thus providing for the payment to the daughter of $100 per month, Edwards had already provided for his daughter before executing this will. This and other contentions growing out of the same matter will be later considered. *Page 656 
It appears from the evidence that for several years prior to his death, Edwards had been suffering from a diseased and enlarged prostate and other diseases which either resulted therefrom or developed concurrently therewith. In 1922, contestant attended Dana Hall, a preparatory school for Wellesley, and entered Wellesley the following year, graduating therefrom in 1927. She spent the vacation period each summer with her parents up to the time of their separation and later she divided the time between them. Upon her return to the west in 1923, she says her father's health that summer was very poor; that he had taken an examination for life insurance and he informed her that the life insurance people said his life was not worth much at that time. He had promised to accompany her east that year when she returned to college but she says he was not well enough to do so. At or about that time, Dr. Sanford Whiting, his then brother-in-law, told him he had but a short time to live. Doctor Whiting died first and testator often boasted that he had outlived him. Each summer thereafter, upon contestant's return home, she observed that her father's physical condition was gradually becoming worse. During the vacation of 1924, she says her father was not the same man that he had been. In 1925, when she came home from college, she says: "It was more apparent that father was not well and that his whole makeup was changing. He was not the same father that I had known in 1922, although he never showed any change in his affection for me." She says he was more irritable and more impatient. In 1926, he was not only ill but in a very nervous state and was almost frantic to be free of his marital relations, and that, because of his physical and mental condition, the *Page 657 
contestant advised her mother to accede to his wishes and obtain a divorce, so that he could have his freedom.
Mrs. Edwards testified that Edwards had been afflicted with prostate trouble for a long time and that in 1926 when the separation took place he was very much worse than formerly. He was cross, irritable, and critical of her and others, while before that time he had always been kind and considerate of her. She says that when he saw persons eating eggs, he said they were crazy. Mrs. Edwards also testified that in 1926, Mrs. Longo told her that her brother's illness was affecting his mind. According to all the testimony, Edwards' physical condition gradually grew worse from 1926 on. He made a hobby of dieting and, while advising others on that subject, he never consistently followed the rules himself. He was much prejudiced against physicians, always distrusted them, saying that they were merely trying to get his money. He had been advised to have an operation for his prostate trouble and had always refused to do so. Upon separating from his wife, he went to San Diego and engaged the services of Mrs. Frances E. Murray as housekeeper, cook and nurse and about the time his wife secured the interlocutory decree of divorce, he became engaged to marry Mrs. Murray. That marriage, however, was never consummated because of his illness, although the relation of housekeeper, cook and nurse continued up to the time of his death, and in his several wills made thereafter she was always named as one of the beneficiaries.
Mrs. Murray testified that she met Edwards in February, 1926, and played tennis with him and some times went in swimming with him. At that time he *Page 658 
complained of a knot and soreness in his bladder and said that when he ate certain kinds of food or indulged in coffee and cigars, it made this soreness more severe. He was, however, an inveterate smoker. In 1927, she says, he was some better. In the summer of 1928, he visited his sister at Seaside and returned quite ill on August 3. On the following day, she says, he had what he called the influenza, from which she says he never recuperated. He just grew worse. He had no pep and could not play tennis and in November of that year he "got very, very bad." He had asthma, his legs were so swollen they almost filled his trousers; he could not sleep, coughed up much blood, and would have nosebleeds considerably. In the following spring he gave up playing cards at the Elks' club, saying he could not concentrate. She says she took him riding afternoons and that he would sleep sitting up in the car like a drunken man, some times during the whole afternoon. She says she noticed that Mr. Edwards' mental condition became affected in the latter part of 1928. He was irritable, hard to get along with, critical of others, his conversations became disconnected and illogical; he would forget the trend of his conversation and find it necessary to start all over again.
It appears from the testimony of Mr. T.F. Patton, who is a registered nurse and claims to give the same treatment as is given in the Battle Creek Sanatarium at Battle Creek, Michigan, that he began treating Mr. Edwards in August, 1928, and continued such treatments until Mr. Edwards' death. He stated that Mr. Edwards was suffering from a bad case of uremic poisoning from which he says Edwards had been suffering for several years prior to the time he first treated him. He says that he discovered soon after he *Page 659 
began the treatment that Edwards had residual urine — that his bladder was continually filled with urine residue which he could not void. He also discovered he had a large prostate gland and advised Edwards that if he would let him relieve the bladder of the urine, it would help him and, to a great extent, lessen the uremic poisoning. He says that Edwards was absent from San Diego and that upon his return, "he was really in bad shape when he came back to me." He says Edwards' legs were swelled up to the knee. He had lost weight through the chest and the poisoning from the retention "was getting in its work." He had the "flu" and was in pretty bad shape. He then advised him to engage the services of Doctor Butterfield.
Doctor Butterfield testified that he examined Edwards on three occasions: November 22, 1928, April 17, 1929, and August 6, 1929. He says that he found Edwards to be suffering from uremic poisoning and that such condition makes a man less acute mentally and, as it progresses, the patient goes into a coma; he is unable to form good judgment and inclined to base his judgment upon reasons which to a normal person would be inadequate and insubstantial.
Edwards also called Doctor Cunningham of San Diego, an osteopathic physician. He testified that Edwards had an enlarged prostate gland and kidney and liver trouble. He says that Edwards "impressed me as being suspicious of everybody, thought they were trying to do him." He also testified that Edwards was the type of man that, if you made a suggestion to him about somebody else, as to a matter of no importance, he would immediately attach importance to it and become suspicious of that person. *Page 660 
He says that Edwards was of a positive type. If he made up his mind that he was going to do a thing, he would do it.
A few days after the execution of this will, Edwards wrote to a friend in Los Angeles, asking him to recommend a diagnostician to give him a physical examination, and this friend recommended Dr. Frederick Speik. Edwards consulted Doctor Speik on March 14, 1929, which was only three weeks after the execution of the will. Doctor Speik says:
"This man came in here, and he was a very sick man, so I sent him to the hospital at Pasadena. His blood count was low and he had high blood pressure; he had an enlarged heart, and he was a little erratic in his mind, because, when I sent him to the hospital, he left early the next morning without consenting to stay there like any normal man would do, for treatment, and it was my idea that he was not in his right mind to do that sort of thing, and also that he had been sick for a long time before he came to me. * * * He might have had that coming on for years. He had a gradual hardening of the arteries, and an enlargement of the heart; he had an enlargement of the prostate gland, which we thought might be cancer; he had this swelling in his feet and ankles, and an abdominal swelling, and those things are just a sequel to things that follow in the weight of chronic nephritis; chronic nephritis is a disease of the kidneys. You don't get high blood pressure, unless you have trouble with your kidneys, and he had trouble with the kidneys; that was very evident. Then, in addition to that, he had an enlarged prostate, and that caused a backing up of the urine in his kidneys, which also affected his kidneys."
When asked if he catheterised Edwards, he said:
"No, I know we didn't, because we don't do it down here. They might have done it at the hospital, but it is not a good thing to catheterise these old men *Page 661 
when they have prostates like that. If you do, the kidneys lie down on you, and they won't function properly. Our method now is to stick a catheter in and drain it off gradually, before they operate on a patient for the removal of the prostate gland, or do a prostatectomy, as we say. Now, they drain a little urine off during the day time; if they took it all off at once, the kidneys would go on a strike and lie down on you, and the patient would die."
When asked what the effect of a physical condition such as that would have upon a person's mental condition, he said:
"Well, it was simply a backing up of the poisons, which are not eliminated, and it is bound to affect the mentality of the individual. * * * I don't think they are as responsible as they would be otherwise. Q. What is their ability to exercise sound judgment? A. I don't think it is good. Q. Would you say whether or not a person in that condition would be more apt to reach conclusions for reasons which to ordinary persons would seem unsubstantial or unsound? A. I should think so. * * * He might be stubborn by force of habit all during his life, and this other thing coming on and encroaching on his mental condition might make him more stubborn in that way. On the other hand, it would affect his mind; there is no question about that, because he was a sick man; this man was more than sick physically * * * he was sick both mentally and physically * * *. He was sick; you could tell that by looking at him. You look at a man like that, and you know he is sick, whether you see him on the street or in the office, because he was pale, and his blood vessels were tortuous in his forehead, showing evidence of a degeneration of blood vessels, a hardening of the arteries and improper circulation."
From his examination and the tests made, Doctor Speik testified that Edwards had a greatly enlarged heart, general arteriosclerosis, secondary anemia, *Page 662 
nephritis and general anasarca. He then says Edwards had "urinary retention, shortness of breath from exertion; his pulse rate was ninety; his blood pressure was 180 over 85; * * * he had a swelling up of his feet and ankles, fluid in his abdomen, enlargement of the heart, and enlargement of the prostate, and he was quite a pale, anemic looking individual. * * * we did not take out the prostate and could not examine it, so we could not tell definitely about whether he had cancer." He then said: "My conclusions are from the fact that he had fluid in his tissues and fluid in his lungs, and he must have had some fluid in the brain, and he must have had some fluid in the heart; that is the reason that these people die of a wet brain, frequently." He then said, "I have taught those things at the local college, at the University of Southern California, when they had a medical school; I was professor of the Department of Medicine at that time."
Mrs. Murray testified that Edwards gave her as his reason for leaving the hospital to which he had been sent by Doctor Speik that when he got to the hospital they put him to bed and the nurse brought him a pill, and he could not sleep for thinking about the pill. She says he said he got to thinking what if Doctor Speik was giving him dope to keep him there to get money out of him, and he couldn't sleep.
In a letter to Mr. Sieberts, dated May 1, 1929, referring to his trip to Portland at the time the will was made, Edwards said: "When I was last in Portland, the condition of my health was precarious * * * My troubles were blood poison with urea. * * *."
With the exception of Doctor Forbes of Seattle, none of the other medical witnesses, except those *Page 663 
named above, had known or seen testator during his lifetime. Edwards went to Forbes' office in company with his sister, Mrs. Longo, a day or two before the will was executed. Forbes said that they conversed together about one-half hour talking in a general way about the effect of prostatitis and Edwards' general health; that he made no examination of Edwards and advised him to come back for a general physical examination so that he could give him an opinion as to the advisability of operating upon him and the nature of the operation; that Edwards said he would do so if he remained in Seattle; that he never came back and Doctor Forbes understood Edwards left the next day for California. He said Edwards' mentality was that of a keen and alert mind and that he saw nothing which indicated any mental impairment.
A number of physicians residing in Portland and in that immediate vicinity were called as witnesses, two by contestant, the others by proponents, and they were interrogated upon the effect which the physical condition shown by Doctor Speik's examination of Edwards would have upon the mind of a person so afflicted and gave their answers in response to a hypothetical question based upon the physical condition Edwards was in as shown by Doctor Speik's testimony. Two of such witnesses, namely: Doctor Burkes, who was called by contestant, and Doctor Evans, who was called by proponents, are men of large experience and training in the treatment of insane patients; Doctor Evans has been for years connected with the Oregon State Hospital for the Insane and is recognized as a man of unusual ability along that line. The same may be said of Doctor Burkes, who, although not connected with that institution, has had charge of patients *Page 664 
in federal hospitals for the insane and is an alienist of recognized standing and ability in his profession. Both agree that uremic poisoning is a cause of mental impairment. Doctor Evans said that he believed that every person who dies of uremia develops mental symptoms prior to death; that cerebral edema in acute form would manifest itself in bringing about various mental symptoms and that cerebral edema is the end result of uremia; that a person suffering from uremia may or may not be subject to delusions; that among the manifestations of uremia are mania and delusional insanity and that these manifestations may come on abruptly in an individual who has shown no previous signs of mental trouble, and that cases of delusional insanity as a result of uremia are by no means uncommon. He said, however, that not having seen Edwards nor having had an opportunity to observe his actions and conduct, he could not, from the testimony of Doctor Speik, pass an opinion upon the question of Edwards' sanity.
Doctor Burkes said that the judgment of an individual in that condition would be impaired and the brain would not function in its normal manner. He says:
"I don't think the man was truly insane; that is, that he was mentally incompetent to the extent of that definition of insanity; but I do think the man was sick, his brain was tired; it was susceptible to emotional upsets and to influences. I don't think a man in Mr. Edwards' condition, making a will during the time that he was emotionally disturbed or upset because someone he thought had given him less consideration than he was entitled to — I don't think that his making the will during that period, that it would be the will that Mr. Edwards would make if he were entirely normal. * * * He was a sick man then; *Page 665 
his mind was sick; he was tired; he was anemic. Perhaps it might have been more or less in the condition that the tissues of his abdomen and legs were, showing swelling and increase of fluids. I think Mr. Edwards made his will, if we must talk on this particular party involved — during the time that he was pitying himself because his daughter had left him, she had not considered him; and in her decision to get married and move to the east, Mr. Edwards at that time was not particularly interested in what was going to be his daughter's future happiness, but he was thinking of himself; and during that period, while he was a sick man, he made this will that has been shown, and this was entirely different from all of his other wills that he made when he was a well man. * * * I think it stands to reason that any man of Mr. Edwards' caliber, having made previous wills, such as he did, having the affection for his daughter that is set forth there in that hypothetical question — then to suddenly change, without reason — I don't believe that man was just exactly right in his mental attitude at the time he made that will; and, getting back to my unqualified opinion, that he did make that will during some emotional distress, and during the time that he was a sick man, I don't believe that it is the will of Mr. Edwards when he was a well man. * * * that is my unqualified opinion; Mr. Edwards was a sick man when he made that will; it is not the will that Mr. Edwards would have made had he not been sick. * * * My opinion is based on the fact Mr. Edwards was a sick man when he made his will and that he showed a sudden change of attitude towards his daughter who had always been very close to him, and that change as indicated by the hypothetical question was the result of self-pity because his daughter had presumed so much as to marry and leave him. I think that would show that he was definitely mentally impaired at the time of the will * * *. In this particular case I want to say again that it is my opinion that Mr. Edwards, at the time he made that last will, was not mentally himself. * * * Considering in *Page 666 
this particular case the man's feelings, or his ego, or whatever you might want to call it, was offended because his daughter had presumed to get married. She was moving to the East and leaving him out here alone. He was pitying himself because he had lost his daughter. He was not considering the fact whether she was going to be happy or not, but he was unhappy. He was pitying himself. He was in a state of emotion, remorse, and in such a state of mind an individual is extremely susceptible to influences or suggestions."
Dr. Dammasch, contestant's witness, says:
"I should say that the man was sick bodily, and probably sick mentally. I would base my conclusions as to the bodily sickness upon four outstanding pathological conditions admittedly present; firstly, generalized arteriosclerosis; secondly, a rather profound degree of secondary anemia; thirdly, upon the general anasarca, or what the layman knows as dropsy; and last, and probably of greatest importance, a chronic uremia."
The conclusion to be drawn from the medical testimony is that a severe case of uremic poisoning is bound to affect the mind of the sufferer and might cause delusions.
A great number of lay witnesses, who knew Edwards in his lifetime, and many of whom saw him about the time the will was made, were called by proponents and almost without exception they testified that they observed nothing abnormal in Edwards' actions or conversations and that they believed him to be sane, and the whole evidence shows that up to a few days before his death, Edwards was competent to transact business and that, as a business man, he possessed more than ordinary ability.
The evidence further shows that Edwards was an inveterate card player, doing his playing at the Elks' *Page 667 
club in San Diego; that he always played for money and generally won, and that this continued until late in 1928, when he told Mrs. Murray he could not concentrate and did not care to lose his money, after which he played but little if any. The evidence further shows that he understood the mechanics of an automobile and talked intelligently with one of the witnesses about the repair of his car, but it appears from the testimony of both Doctor Evans and Doctor Burkes that many inmates of insane asylums are expert card players and some of them were exceptionally good mechanics.
The evidence shows that Edwards left San Diego on February 8, 1929, and came to Portland. While there he executed this will. His former wills had been prepared by either Mr. Shively or Mr. Latourette, both of whom are prominent attorneys of Portland. He did not consult them in reference to this will but went to the office of Mrs. Bessie F. Colwell, a public stenographer, taking with him a copy of one of his former wills and some handwritten notes which he left with her, telling her what provisions he wished inserted in the will. He then went to the home of his sister in Seattle, staying there a day or two. It was while on this trip to Seattle that he consulted Doctor Forbes. He then returned to Portland and executed the will that Mrs. Colwell had prepared for him and then returned to San Diego. At the time he signed the will, Harry Bert Bowe, an employee of the Royal Typewriter Company, came into the office. At the request of Mrs. Colwell, he went into the room where Edwards was and, at his request, signed the will as an attesting witness. Both say that Edwards was normal and sane at the time he executed the will. Mrs. Colwell had known him for several years but Bowe had never met *Page 668 
him before and was with him but a few minutes. As said by the court in Culpepper v. Robie, 155 Va. 64 (154 S.E. 687):
"The testimony of attesting witnesses to documents is entitled to `great weight,' or as the courts sometimes express it, `peculiar weight.' [Citing authorities.] This `great weight' certainly should be given to the evidence of subscribing witnesses as to the execution of the instrument. Even to this act, however, such evidence is not conclusive. Page on Wills, § 664; Jenkins v. Trice, 152 Va. 411, at page 426, 147 S.E. 251."
As against this testimony, proponents introduced numerous witnesses who were not merely casual acquaintances and who knew Edwards more intimately. Mrs. Murray testified that she noticed Edwards' mental condition became affected in 1928; that he became irritable, hard to get along with, critical of others and his conversations became disconnected and illogical. He would forget the trend of his conversation and find it necessary to start all over again.
Mrs. Edwards testified that before he became ill, he was always neat in his appearance, kind and affectionate, and he was very modest, but after he became ill, he grew egotistical and self-centered. He talked about himself and his sickness and tried to force his opinions on others.
Mr. Stanley H. Daniels, a retired merchant of San Diego, who had known Edwards socially for about four years, testified that Edwards was a guest at his house on December 8, 1928, at a birthday party. He says Edwards' actions were radical. He was cross and snappy at different things, and he walked the floor. It was the same crowd that Edwards always associated with and played with, and with which he was on the *Page 669 
very best of terms, "yet he acted like he was — well, he didn't act like himself at all. * * * He wouldn't keep to any subject; he would start on a subject — he would start something and pretty soon he would stop, and pretty soon he would go on to something else clear off of it, and after he left, my wife said, `What's the matter with that Edwards, anyway?'" He saw Edwards again on March 16, 1929, at a funeral, and he says Edwards "acted like a crazy man, and he looked about like a man that was ready to drop into a coffin; he looked sicker than the man that was laying in the coffin." He says that Edwards would come over to the tennis courts with Mrs. Murray sometimes "but he didn't play tennis, but he would sit there and I would talk to him, and he would talk rationally, and maybe the next time he came over there he didn't talk rationally at all, and he would make remarks against Mrs. Murray, and against one or two of the other players that wasn't — he was a man that usually — in fact, he never did that before." In regard to his mental condition subsequent to December, 1928, he says: "I would say it was like anybody else's that was just about ready for the grave and had been sick as long as he was, — that his mentality was a way down, * * * he was just down and out, a sick man, that's all; he could not concentrate; he couldn't keep on subjects, and he was radical on things." On cross-examination, he says: "I am giving you the impression that he was not acting natural and normal, or he was not acting the same as any of the rest of the men there; that's the best I can tell you." "Q. What urges you to that conclusion? A. Why his actions. * * * the man was not normal — he wasn't his natural self; and I am judging that from all of his actions and the way he behaved himself at the party." He says that on a *Page 670 
picnic, the date he does not remember, Edwards wouldn't eat white bread, said he would just as soon eat poison as eat white bread, but he ate a lot of cake, and took some of it home with him. He says further: "I considered him a sick man, with spells that he really wouldn't be fit for any kind of a business deal, or anything else." He says that he thought there were times when Edwards was insane on all things.
Mrs. George Kahrs, one of contestant's witnesses, testified that she first met Edwards in 1925 and that she and Edwards frequently played tennis together before she went to work in the mornings and on Sunday mornings, and that Edwards was a most "admirable character in every way" when she first became acquainted with him. She visited Mrs. Murray's apartment in April, 1929, the spring before Edwards died, and saw Edwards there. At that time he looked "fifteen or twenty years older. The day before, when I had seen him, he had been well, and the time when I saw him up there, he looked very ill." She says she inquired after his health and he said that he had been taking some baths or massage from some young man "and he went on talking about that for about half an hour, wandering around and I was greatly surprised, because Eddie was usually a man of few words, and did not dwell on a subject unnecessarily. * * * He was acting in an unnatural manner; * * * he was sitting with his legs apart on his chair, and his legs were all swollen up so they almost filled his trousers. * * * I concluded that at the period that I visited him there in the apartment, at the time I just mentioned, he certainly was mentally off. Q. What do you mean by `mentally off'? A. Well, he was acting in an unnatural manner, mentally not himself, abnormal; that describes it exactly." *Page 671 
As stated contestant, Edwards' only child, was born on July 6, 1905. She married Earle in the spring of 1928. All the witnesses who testified in respect thereto, say that Edwards loved his daughter with an intensity which amounted almost to adoration. She was amiable, affectionate and talented and she idolized her father. In respect to the mutual love of the father for his daughter and of the daughter for her father, there is not a single discordant note in the testimony. In fact, proponents so admit in their petition for the reprobate of the will, and they state in their brief filed here that this love upon his part continued up to the time of his death. In another part of their brief, however, they contend that Edwards lost all affection for his daughter because, at the time of the separation and divorce of Edwards and his wife in 1926, she sided with her mother against him. They base this later contention upon the following excerpt of testimony given by contestant while on the stand, in which she said: "I tried to reason with my father. I tried to show him that he was being cruel to my mother; that he was very unkind to her; that he was not being fair to her and he would not listen to me." From this statement of hers, they argue that she sided with her mother and took her mother's part against her father and that that fact caused him to lose all his affection for her. This contention upon the part of the proponents is refuted by all the testimony. During the remainder of that year, as well as during the following year, he wrote her numerous letters in which he manifested toward her the same love and affection that he had always entertained for her before the separation took place. After spending the summer of 1926 with him, the daughter returned east in September of that *Page 672 
year and immediately following her departure, he made a new will in which he left to his daughter a substantial part of his estate. In the summer of 1927, the daughter met him at Los Angeles upon her return after her graduation from Wellesley with honors and spent a considerable time with him at his apartments in San Diego. She then came to Portland with him, keeping house for him there for two weeks and, after her return east that year to take a postgraduate course in music, he stated to others that it was the pleasantest summer he had ever spent. On the day she returned east that year, he made another will, in which he gave her a larger portion of his estate than he had in any of his former wills. In the spring of 1927, she wrote him that she had met and fell in love with Mr. Earle. After receiving that letter, he wrote his daughter on April 24, 1927, saying: "You need have no apprehension that I may make any objection to any young man that you decide on for a husband. I am glad that you have made a decision." He also wrote her: "Your ancestors have saved for two generations to try and leave you financially independent." Later and on May 7, 1927, he wrote her: "You may rest assured, however, that I have no reason or intention to ever advise you not to marry this man, or any other man whom you may select." On the following Christmas he sent his daughter his check as a Christmas gift.
After the daughter's graduation in 1927 and while with him during her summer vacation, she told her father that she was engaged to Mr. Earle and wanted to marry him; that he was a student and intended to study law which would require his attendance at a law school for three years before graduation, and that she wanted to return east in order to be near him. Edwards *Page 673 
made no objection but advised her that, since Earle was studying law, that would be the proper thing for her to do; that it would develop her mind and be a benefit to her in after years. He advised against a postgraduate course in music but did not insist that she should not take up music. She informed her father that she intended to be married the following year and, upon leaving her, he promised to attend her wedding. With that understanding she returned east and took up music and was married the following year.
Up to that time he had always said, both in his letters and conversations with his daughter, that he hoped she would marry as soon as she graduated and that she would proceed to raise a family so that he could enjoy the children. He expressed the same wish to others. Mrs. E.M. Morgan says that in the summer of 1926, at his home in Portland, he stated to her and others then present, that when Virginia was graduated he wanted her to marry, adding that if she would get married upon her graduation, he would give her a wedding trip to Europe, and he told them at that time that he wanted her to have a family so that he could enjoy the children. Mrs. Helen E. Harding says Edwards told her that he hoped Virginia would marry and proceed to have a family upon her graduation. Mrs. Murray testified that Edwards repeatedly stated to her that he hoped his daughter would marry.
In his letter to his daughter at Christmas time in 1927, he stated that he was glad she was really doing something with her music. Some time that winter she wrote him, stating that Earle had gone to Florida to see his father. Upon receipt of that letter, he wrote her saying that he thought it very extravagant for Earle to go to Florida to see his father, and that he was sorry he had promised to see her married. Again, *Page 674 
on March 14, 1928, the day on which she was married, she received a letter from her father in which he stated that he thought Earle was an adventurer who wanted to marry her for her money. In the summer of 1928, he wrote her that she had left him just like the birds leave the nest; that she no longer loved him; that the parents cared for the child but the child never cared for the parents; that it was natural for the child to leave the parents but that they had to bear up with it, and in his case, he was going to forget his daughter — put her out of his life — and that he did not want to correspond with her any more; that corresponding with her was distasteful to him and he wanted to break off immediately, and he did not want to have any more correspondence with her.
There is nothing in the evidence to show any reason for this sudden revulsion upon the part of Edwards toward his daughter except his mental condition at the time or the fraud and undue influence of his sister, Mrs. Longo, to which we will later refer. Within a few days after his daughter's marriage, Edwards changed the name of the beneficiary of an insurance policy that had been issued to him in 1919 from Edwards and Company to that of his niece, Ann Elizabeth Whiting, the daughter of Mrs. Longo, and, when Mrs. Edwards returned west after the marriage of her daughter, she received a letter from Edwards expressing his sympathy on their mutual loss of Virginia. On September 27, 1928, he again wrote Mrs. Edwards, stating that on October 31 he would deposit in Portland the securities for the establishment of the $90,000 trust. In this letter, he says: "You remember I suppose that the income was stipulated at $400 per month, of which $300 was to you and $100 to *Page 675 
Virginia. Of course, as she is now married, maybe she won't need it and if you insist the whole amount might be arranged as payable to you."
Mrs. John W. Kemp, who resided at Los Angeles, and whose husband, until his death in January or February, 1929, was the head of the firm of Kemp, Partridge and Kemp, and who had been employed by Edwards to negotiate the settlement with his wife, testified that shortly after contestant's marriage, Edwards came to her house and said: "Mrs. Kemp, I thought I was going to hold myself together — I thought I was going to get over this, but the minute I saw you, it has all come over me," and she says he sat down and put his head forward on his hands and knees and indulged in a debauch of self-pity, that he had lost Virginia, that he would never see her, and that he had looked forward to seeing her at Christmas time, and seeing her and her children. She says she asked him "Well, Mr. Edwards, does it mean nothing to you that Virginia has married the only man she ever loved?" and he said, "Mrs. Kemp, a woman doesn't have to marry the only man she has ever loved." "I know a woman who thought she was in love with a man, and they pulled out all right. * * * She doesn't have to marry that man." Mrs. Kemp says: "In that conversation, when he spoke of this woman that could turn a man down and go and live some place else, he said, `She could marry a man even though she didn't love him so much,' and I said, `Mr. Edwards, some women, but not Virginia.' And so that was in May, and it didn't seem to be so much against Virginia, but his loss of Virginia, — that she was across the continent, and she had gone from him, and I said, `Mr. Edwards, you have lost your little playmate; you are feeling sorry for yourself.'" *Page 676 
In November, 1928, contestant received word that her father's health was very poor and that he was in a very serious condition. She immediately came west and, upon reaching Los Angeles, she went to her mother's apartment and called her father over the telephone. Upon hearing her voice, he told her he was delighted and two days later he came to Los Angeles and spent a week there with his daughter and Mrs. Edwards, stopping at the Elks' club. The father and daughter then went to San Diego and she remained with him for several weeks at his apartment. She says that her father was very happy to have her with him, but that she was shocked at his physical appearance.
Mrs. Edwards testified that when Edwards came to Los Angeles to meet his daughter, he stayed a week and "was in a very happy frame of mind being there with Virginia, and he included me in a great many of the things they did." Contestant stayed in San Diego with her father until two days before Christmas, and while there they visited the home of Mrs. Kemp, and this is Mrs. Kemp's testimony as to what took place at her home between Edwards and his daughter; less than two months before the will in question was made:
"They went up to Mr. Kemp's bedside and Mr. Edwards was giving his theory of diet, which was a hobby of his, and then explaining the effect of certain diets, and doing it most logically, and Virginia sat there by the bed, and never took her eyes off her father; she was wrapped up in her father; she admired his mind, and she admired him; and while she adored him as a father, I could see that day that she thought he was extreme. Mr. Kemp spoke of it — of the adoration of that girl for her father. Well, then, they came down stairs, and I played for Virginia to sing, and Mr. Edwards was over in the corner getting *Page 677 
some books out. Virginia sang, and I glanced up, and he was looking at her, beaming upon her. Well, after she got through, he went over, came up to her, and she took his arm, and he took her hand and patted it, and loved it, she smiling up at him, and they walked back and forth, absolutely unconscious that I was there, like a pair of lovers, back and forth, and back and forth, and he patting her hand and beaming down on her."
Mrs. Kemp says that later in the following summer of 1929, she received a telegram from Mr. Edwards, asking her to meet him for lunch down town, and she says:
"It was frightfully hot, so I wrote him back that I thought he would enjoy coming out here with me, and it was cool; so he answered — he said that he thought it would take me away from unpleasant surroundings; he just did this to get me away from home, but it wasn't that he had to apologize, you see. It was only that he thought that he was doing the kind thing to me. He came out in a taxi, a little, sick, brown man, with his hair matted about his forehead, and dull, dull eyes — the sickest looking man I ever saw on his feet. He came in here and collected himself for a few minutes; and I thought then I should have to put him to bed. He went out to the breakfast table, and I had made a resolve that I would not mention Virginia. I knew that he was going to be here an hour or two, and I resolved that her name should never come from my lips; I would not remind him. He looked up with that sick, disheartened, blank stare: `Mrs. Kemp, I have lost Virginia.' `Well,' I said, `you have gained a son; you haven't lost Virginia.' Well then, we came in here, and it was a changed Mr. Edwards from the time we began to talk in here. He said, `You know, Mrs. Kemp, I was disappointed; I wanted Virginia not to give up her career — that is, her music.' * * * `Why,' I said, `Mr. Edwards, what is a career?' I said `In a few years, she will not be singing * * * she *Page 678 
is building her own little home, building that little nest, and her mother said she even made the curtains at the windows. That is the way to do; grow together, to start out building up. She writes of making a tie for Harper.' He sat there with that staring, that blank uncomprehending look for a minute, and then he said: `Mrs. Kemp, you have set me thinking.' Then he comes in — it is a case of Doctor Jekyll and Mr. Hyde: it is Mr. Hyde one time, and Doctor Jekyll again; he is a changed being. He starts in with the letters that he has had from this child he has lost, and he tells in detail how she is coaching Florence Claire, that is the little sister of Harper, (her husband) * * * He is so happy to have her doing something worth while. Then we go on, and we discuss Virginia's life, and what she is doing, and these little things that I have told you, just about the coaching of the girl, and he is so happy that she is occupied. * * * I said, `Of course, you know what Virginia's marrying Harper meant to me, — how fine he was, for she didn't marry him hastily, she thought it over, she was not engaged but a short time,' and I said, `I sat by Mrs. Bullock at a tea one day, and happened to say that Detroit meant to me just one person, — Virginia Edwards — who had married Harper Earle, and asked did she know the family, and she said, `Yes, I know they have a fine standing there. I haven't seen Harper since he was a little boy, but he couldn't be anything but a success, if he is like his father.' Mr. Edwards knew it; he knew only that he had just that feeling that his daughter was away. Well, there was some conversation, and then Mr. Edwards was the bright, happy Mr. Edwards that I have seen when he was with Mr. Kemp and me, and when he took us to dinner, he was just as jovial as any boy of twenty, when we were at the Ambassador that night; and then when Mr. Kemp and I were together with Mr. Edwards, he would pull himself together; he was in physical distress, and he would get up and walk around a while, and then finally he went out in the living room and walked back and forth * * * and came back and took a chair in the middle *Page 679 
of the room. He said `Mrs. Kemp, the only thing I have against Virginia's husband is his youth.' I said, `Well, Mr. Edwards, give him time, and he will overcome that,' and he went out of this house as happy as I have ever seen anybody; the world was a bright place to him. He was going to see Mrs. Edwards, and the taxi was out there; he was impatient to get to her, to visit with her, spoke so beautifully of her and Virginia — there was nothing wrong, — nothing but the youth of that boy. * * * he got here at one o'clock, and I think it was probably between three and four, because he had to take the evening train to Portland, and he wanted to have a visit with Mrs. Edwards before he left; and as he left, he said, `Mrs. Kemp, I can't tell you what you have done for me.' He shook hands, and he says, `I can't tell you what you have done for me.'"
It appears from the evidence that until Edwards became ill, he was of a very positive nature, very stubborn in his own opinions and not easily influenced. He would argue with no one. If anyone disagreed with him, he would leave them and not argue the matter with them. His sister, Mrs. Longo, however, the evidence shows could always influence him. She had the power of insinuating in his mind thoughts and ideas by suggestion and make him believe they originated in his own mind. The evidence shows that in January, 1928, Mrs. Longo for the first time learned definitely that the daughter was about to marry Earle. Up to that very moment there is not a syllable of testimony in the entire record of any revulsion of Edwards in his love and affection for his daughter. The uncontradicted evidence of Mrs. Murray is that as soon as Mrs. Longo learned of the contemplated marriage, she commenced to write Edwards, criticising his daughter. She wrote him that Virginia, when she graduated, should have come west and stayed with her *Page 680 
father; that she should have waited until Earle had finished law school before marrying him, and that, if Virginia had had a proper appreciation for her father and had loved him, she would have stayed with him at least one year before she married. She also wrote him that Virginia had made her choice between the Earles and him and that the Earles were fortunate to have obtained a daughter who was a cook, housekeeper, nurse and tutor. Mrs. Longo was a witness in the case and she did not contradict any one of these statements nor was there any attempt made by cross-examination of Mrs. Murray to discredit her testimony in respect to any of these matters. Mrs. Longo's hostility to the daughter is disclosed not only in the letters above mentioned but also in the subsequent statements to Edwards and to others. In April, 1929, in discussing the matter with Mrs. Catherine Hanna, a close friend of the Edwards family and of Mrs. Longo, she said: "Well, you know, Tom is absolutely through with Virginia. * * * I feel the same way about it. * * * The idea of Virginia marrying a boy who hasn't finished school." On a later occasion she told the same thing to Mrs. Kemp, saying: "Virginia should not have married; she should have come west and stayed here a year with her father. * * * He gave her her education and she should have given him that year." Again in August of that year she told Mrs. Hanna that she was very much interested in Sanford Whiting, Jr., who was her stepson and that she had succeeded in getting Tom, her brother, interested in him, and she said: "I hope Tom is going to leave Sanford something in his will." The will shows that she was successful in securing for him 1/20 of the net income of testator's estate. Mrs. Longo also said to Mrs. Kemp: "I said to Tom, `that's what you get *Page 681 
for sending her to an eastern college.'" Mrs. Kemp, in referring to Mrs. Longo's attitude toward Virginia, said: "She was entirely against Virginia's marriage with Mr. Earle, and seemingly trying to influence her brother, and keep him in a dark, drab mood." Just after Edwards' death, Mrs. Longo told Mrs. Edwards that Virginia had been disloyal to her father. Again, in a conversation with Mrs. E.E. Morgan which took place just before the daughter's marriage, Mrs. Morgan said to Mrs. Longo: "Isn't it too bad that we cannot see Virginia married?" to which Mrs. Longo replied: "Yes, I am as mad about it as I can be and Tom is just as mad about it as I am."
In view of the above statements made by Mrs. Longo in her letters to her brother and the declarations she made to others about Virginia, it is obvious that she intended to prejudice the disordered mind of her brother against his daughter and thereby secure for herself and the members of her own immediate family a part at least of what otherwise he would have left to his daughter. These declarations made as they were after January, 1928, to Edwards of whom she had said in 1926 that his illness was affecting his mind, and knowing as she did in 1928, that his mental and physical condition had gradually grown much worse, shows, when taken in connection with this will, that she was not only attempting to but that she actually did succeed in poisoning the mind of her brother against his daughter and in leading him to believe that his daughter had forsaken him and no longer loved him. It was not true that the daughter had forsaken the father and no longer loved him, and Mrs. Longo knew it was not true when making those declarations. Her declarations to that effect were fraudulently and falsely made and had the effect of causing her brother *Page 682 
to make this unjust and unnatural will, virtually disinheriting his daughter, under the unfounded delusion that his daughter no longer loved him and that she was lost to him forever. Such a will ought not stand.
It is an established fact recognized both by the medical profession and the courts that mental derangement may be confined to one particular phase of a person's life. Both Doctor Evans and Doctor Burkes tell us that insane asylums are full of men who are good card players and talk rationally on most subjects.
There is not the slightest allusion in the testimony to any act of the daughter of disloyalty or of want of love upon her part for her father or that she ever acted contrary to his wishes or did anything which could afford any ground for his sudden revulsion toward her. This revulsion can be explained only, so far as the whole evidence shows, upon the mere fact that, because of the daughter's marriage, it was no longer possible for her to remain in his presence and, from the fact of her absence, he imagined he had lost her. This unfounded belief upon his part was the product of a disordered mind operated upon by the false statements of his sister.
As was said by the court in Dew v. Clark, 3 Addams' Eccle. Rep. 79, 180:
"In most cases of delusion, the delusion founds itself, originally, on some slight circumstance, the magnifying of which, beyond all reasonable bounds, is nearly, or quite, as good in proof of its being a delusion, as the taking up of some absurd prejudice, which is utterly unfounded, or that rests upon no basis."
"It is of the essence of an insane delusion that as it has no basis in reason so it cannot by reason be dispersed and is thus capable of being cherished side by side with other ideas with which it is rationally inconsistent." Smith v. Tebbit, 1 Law Rep. 398, 434. *Page 683 
As was said by the court in America Bible Society v. Price,115 Ill. 623 (5 N.E. 126, 130):
"Obviously, if there be morbid or insane delusion in the mind of the testator as to one of the natural objects of his bounty, its effect upon his capacity to reason in regard to that object of his bounty could in nowise be measured by his capacity to reason upon subjects unaffected by that delusion."
We, therefore, conclude that this will is the joint product of a morbid delusion of the testator that he had lost the love of his daughter and of the fraudulent representations made to him by his sister, inducing him to entertain that delusion and that, because thereof, the will is invalid and must be set aside. In order, however, that there shall be no misunderstanding of the reasons for our decision, we say unqualifiedly that it is not alone because the will itself is unnatural and unjust that it is set aside. We base our decision upon the fact that the testator's mind at the time he made the will was seriously impaired and he had been fraudulently led to believe that his daughter had left him and no longer loved him and that these facts, when coupled with the provisions of this will which virtually disinherit the daughter, are sufficient grounds for holding the will to be invalid, and, upon those grounds, we have been constrained to so hold.
The decree of the lower court should be reversed and a decree should be entered here setting aside the will and declaring that Edwards died intestate in law, but since the court is evenly divided, one of the justices being disqualified, the decree must, under the provisions of the statute, be affirmed and it is so ordered.
CAMPBELL, J., not sitting.
BEAN, C.J., and BROWN, J., concur in this opinion. *Page 684